Arthur E. Cline, as President of the Independent Retail Petroleum Products Dealers of Jefferson County, Plaintiff, *v.* Consumers Cooperative Gas and Oil Company, Inc., Defendant.

Supreme Court, Jefferson County, September 22, 1934.

*Purcell, Cullen & Reynolds*, for the plaintiff.

*John Conboy*, for the defendant.

SMITH (E. N.), J. The motion is made under rule 106 of the Rules of Civil Practice, on the ground that the complaint does not state facts sufficient to constitute a cause of action. On this motion the court has before it only the complaint, and, in considering it, assumes the allegations of the complaint to be true.

The Independent Retail Petroleum Products Dealers of Jefferson County, as president of which the plaintiff brings this action, is an unincorporated association consisting of seven or more persons, all of whom are engaged in the retail sale of petroleum products in Jefferson county, and all of whom, it is alleged, have an interest in this cause of action. The defendant is a corporation organized under the Co-operative Corporations Law of the State of New York, engaged in the sale at retail of gasoline and other petroleum products in the city of Watertown, Jefferson county, N. Y.

The plaintiff fails to state the time when the defendant co-operative was organized, further than to allege that " since September 26, 1933, and continually up to the present time the defendant has been and is engaged in the retail sale of gasoline and other petroleum products to the public."

The complaint alleges that since September 26, 1933, the defendant has sold and continued to sell gasoline at its pumps at prices lower than the prices posted on its pumps used for dispensing of gasoline, in violation of the Code of Fair Competition for the Petroleum Industry; that " the defendant has deviated from the prices posted on its gasoline pumps in its sales to consumers by means of rebates, concessions, benefits and other devices and has permitted, and still does permit, the buyer to obtain gasoline at its pumps at a net lower price than the applicable posted price, in violation of the code of fair competition for the petroleum industry," and then the complaint alleges that " By reason of the aforesaid manner of giving rebates, concessions and benefits to its customers by this defendant, this plaintiff has lost, and will in the future

lose, trade in his petroleum business, all to his pecuniary damage, and he will meet with similar damage in the future if this defendant continues the aforesaid practices," and that "it is the intention of the defendant to continue to sell gasoline in the manner aforesaid, thereby interfering with the plaintiff's legal right to be protected against unfair competition under said code," and that "Serious and irreparable damage will result to the members of plaintiff's association in that they will be required in many instances to sell gasoline at less than the prevailing price in order to meet the unfair competition of the defendant, if said defendant is not restrained by this Court from continuing the aforesaid practice of selling petroleum products in any manner which violates said code." And then the plaintiff asks for an injunction restraining the defendant from selling petroleum products "to consumers at other than one price for each brand, grade or quality of petroleum products sold, and that the price be posted conspicuously at the place from which delivery is made and at places there readily accessible, during business hours, to the public, and in effect for at least twenty-four hours after such posting," and further asks that the defendant "be enjoined and restrained from making any deviation from its posted prices for petroleum products sold at retail by any means of rebates, allowances, concessions, benefits, scrip books or other device, whereby any buyer obtains any petroleum products at a net lower cost than the applicable posted price."

The character of this action, in which competitors in business seek the aid of the court to prevent a dealer from selling to the public his products at any price which he may see fit, is so extraordinary that it leads to an inquiry as to the foundation upon which the right to bring this sort of an action is claimed to rest. Here we have a body of dealers in a retail business who apparently have combined among themselves to fix the price of gasoline which consumers shall pay, in violation of the express provisions of the laws of this State against combinations in restraint of trade, seeking an injunction from a court of equity against a defendant who is selling at a price lower than this combination is selling gasoline to the public. When stripped of all subterfuge, this is just what this action means. Furthermore, this leads to an inquiry as to why this defendant is required to post any price. As a practical necessity, of course every retail gasoline dealer does post a price at which he will sell his gasoline. The answer to these inquiries is to be found in the allegation of the complaint, in paragraph 3, to the effect that on or about August 19, 1933, the President of the United States, pursuant to the provisions of the National Industrial Recovery Act, approved and signed a Code of Fair Competition

for the Petroleum Industry, and (at paragraph 4 of the complaint) that "Article V, Rule 3, paragraph 4 of said Code requires that 'All retailers and others who sell to consumers, shall conspicuously post at the place from which delivery is made, * * * one price at which each brand, grade, or quality ' of petroleum products is sold. Paragraph 5 of that section (*sic*) requires that all sales shall be made at the posted price applicable to the brand, grade or quality of the commodity sold. Paragraph 7 of that rule provides that no one shall make any change, variation or deviation from his posted price by means of rebates, allowances, concessions, benefits or any other device whereby any buyer obtains petroleum products at a net lower cost than the applicable posted price."

This leads to an inquiry as to what the National Industrial Recovery Act provides.

The National Industrial Recovery Act, effective June 16, 1933, and being a part of title 15 of the United States Code (Commerce and Trade), and being sections 701 to 712, both inclusive, thereof, provides, so far as applicable to the instant case, as follows:

" § 701. A national emergency productive of wide-spread unemployment and disorganization of industry, *which burdens interstate and foreign commerce*, affects the public welfare and undermines the standards of living of the American People, is hereby declared to exist. It is hereby declared to be the policy of Congress to remove obstructions to the free flow of *interstate and foreign commerce* which tend to diminish the amount thereof."

" § 703. Codes of fair competition. * * *

" (a) Upon the application to the President by one or more trade or industrial associations or groups, the President may approve a code or codes of fair competition for the trade or industry or subdivision thereof, *represented by the applicant or applicants*, if the President finds (1) that such associations or groups impose no inequitable restrictions on admission to membership therein and are truly representative of such trades or industries or subdivisions thereof, and (2) that such code or codes are *not designed to promote monopolies or to eliminate or oppress small enterprises* and will not operate to discriminate against them, and will tend to effectuate the policy of this title: *Provided That such code or codes shall not permit monopolies or monopolistic practices.* * * *

" (b) After the President shall have approved any such code, the provisions of such code shall be the standards of fair competition for such trade or industry or subdivision thereof. Any violation of such standards in any transaction in or affecting *interstate or foreign commerce* shall be deemed an unfair method of competition in commerce. * * *

" (c) \* \* \* The several district courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of any code of fair competition approved under this chapter, and it shall be the duty of the several district attorneys of the United States in their respective districts, under the direction of the Attorney-General, to institute proceedings in equity to prevent and restrain such violations."

" (f) \* \* \* When a code of fair competition has been approved or prescribed by the President under this chapter, any violation of any provision thereof *in any transaction in or affecting interstate or foreign commerce* shall be a misdemeanor and upon conviction thereof an offender shall be fined not more than $500 for each offense, and each day such violation continues shall be deemed a separate offense."

From a reading of these provisions, three things stand out: (1) That these provisions of the National Industrial Recovery Act are not designed to affect or in any wise interfere with intrastate commerce, excepting possibly in a case where intrastate commerce might be so intimately related to interstate commerce that such intrastate commerce might be found as a fact to operate in such a manner, in a particular case, as to defeat or seriously impair the operation of the said Federal law, or regulations or codes adopted thereunder, in relation to interstate or foreign commerce, there is no basis whatsoever for any contention that, either directly or indirectly, the National Industrial Recovery act was designed to interfere with or regulate intrastate commerce. (2) That the National Industrial Recovery Act, unlike any other act of Congress or of State Legislatures, where the power to make administrative regulations is delegated, fails to set up any standard of fair competition to operate as a declaration of policy, or a guide, or a limitation upon the power to make regulations. There is here delegated by the Congress complete power to the President to promulgate codes of fair competition, limited only by the conditions above quoted in reference to membership in associations participating in making the codes, and as to monopolies. (3) It is also clear that, as to enforcement of the act and of the codes of fair competition adopted under it, the sole agency for such purpose is the Attorney-General of the United States, acting through the United States district attorneys, and that no individual has any power to institute proceedings for such enforcement, either in equity or in law. The only right of an individual, so far as proceedings in court are concerned, would be to institute proceedings for the protection of himself in the event that he felt that by the operation of any code his fundamental rights were being jeopardized or adversely affected.

The third paragraph of the complaint reads: " 3. On or about the 19th day of August, 1933, the President of the United States, pursuant to the provisions of the National Industrial Recovery Act, approved and signed a Code of Fair Competition for the Petroleum Industry."

The fourth paragraph of the complaint reads: " 4. Article V, Rule 3, paragraph 4, of said code of fair competition for the Petroleum Industry, requires that all retailers and others who sell petroleum products to consumers shall conspicuously post at the place from which delivery is made, one price at which each brand, grade or quality of petroleum products is sold. Paragraph 5 of that section (*sic*) requires that all sales shall be made at the posted price applicable to the brand, grade or quality of the commodity sold. Paragraph 7 of that rule provides that no one shall make any change, variation or deviation from his posted price by means of rebates, allowances, concessions, benefits or any other device whereby any buyer obtains petroleum products at a net lower cost than the applicable posted price."

By stipulation the Code of Fair Competition for the Petroleum Industry is made a part of the complaint, and said code does contain the provisions as alleged in the complaint.

The preamble of the code recites the emergency in the petroleum industry, the purpose to conserve the nation's petroleum resources and to restrain and avoid recurring abuses in the production, transportation and marketing of petroleum and its products which directly obstruct the free flow of *interstate and foreign commerce* by causing abnormal and destructive temporary fluctuations in the supply of petroleum or its products that are not responsive to the actual demand and prices and disrupt the normal flow of *interstate commerce* in petroleum and its products.

It is obvious that the President, under the delegation of power to make codes of fair competition in the National Industrial Recovery Act, gained and could gain no authority whatsoever over intrastate commerce.

The defendant is a retail dealer in petroleum products, especially gasoline, and its transactions are wholly within the State of New York; it is a co-operative, duly organized and operating under the laws of the State of New York.

Rule 28 of article V of said code provides that this code " shall not prevent an association, society or corporation organized or incorporated on the co-operative plan under any law of any State, * * * as defined in Rule 29 of Article V of this Code, from paying patronage dividends to members or stockholders of such organization in accordance with the provisions of the law, * * *

and the payment of such patronage dividends by such co-operative organizations shall not be construed as a violation of this Code, nor shall the payment or distribution of such dividends be construed under this Code as an unfair method of competition; it being specifically understood that such dividends shall not be paid to non-members or non-stockholders."

Rule 29, above referred to, provides that " cooperatives *organized and existing on July 1, 1933* and which comply with paragraph 12, Section 103, of the Revenue Act of 1932, and which distribute their patronage dividends to such members only, shall be exempted from certain provisions of this Article 5 as hereinbefore specified; provided, however, they shall be otherwise fully subject to the provisions of Article 5."

I am here confined to the allegations of the complaint. There is no allegation of the complaint to the effect that the defendant co-operative was organized and existing on July 1, 1933; consequently, for the purposes of this motion, there is nothing in the complaint to show that the defendant co-operative has any of the exemptions from the operation of the code provided for in said rules 28 and 29. So that, for the purposes of this motion, the defendant stands in no other or different position than any other retail dealer excepting as hereinafter noted.

By stipulation, the oil code, corrected to May 24, 1934, as published by the *National Petroleum News*, is, for the purposes of this motion, the code under consideration. It consists of seven articles and rules thereunder. So far as this motion is concerned, only· article V has any application. Under this article V, governing marketing, there are thirty-one rules, a few of which are involved herein.

" Rule 1. The provisions of this Code relating to transactions of refiners, distributors, jobbers, or wholesalers with retailers and others selling or consigning petroleum products to consumers shall apply to all accounts, of any description under which refiners, distributors, jobbers, or wholesalers sell their products or cause their products to be sold to consumers or to retailers, or to others selling petroleum products to consumers."

It is obvious that this rule applies only to refiners, distributors, jobbers or wholesalers in their dealings with retailers or their sales to retailers, and has no application to a sale by a retailer to a consumer.

Rule 3 of said article V contains the following provision applicable to the present motion:

(Paragraph 4.) "All retailers, and others who sell to consumers, shall conspicuously post at the place from which delivery is made,

and at places there readily accessible during business hours to the public, one price at which each brand, grade, or quality of naphtha, gasoline, motor fuel, lubricating oil, grease, kerosene and heating oil are sold."

(Paragraph 7.) "No one shall make any deviation from his posted price by means of rebates, allowances, concessions, benefits, scrip books or any other device whereby any buyer obtains any naphtha, gasoline, motor fuel, lubricating oil, grease, kerosene or heating oil at a net lower cost than the applicable posted price."

It is obvious that, so far as these paragraphs of rule 3, article V, in any wise affect intrastate commerce, the promulgation or approval of these paragraphs of rule 3 by the President, acting pursuant to the provisions of the National Industrial Recovery Act, was unauthorized thereby. The President was delegated authority only to make or approve codes of fair competition with respect to interstate commerce.

And this leads to the inquiry as to whether or not this defendant is engaged in interstate commerce. The allegations of the complaint are to the effect that the members of the plaintiff's association are engaged in the retail sale of petroleum products in the city of Watertown and Jefferson county. The allegation as to the defendant is that it " is engaged in the retail trade of gasoline and other petroleum products " in the city of Watertown, Jefferson county, N. Y.

Without in any way passing upon the question of the constitutionality of the National Industrial Recovery Act in its general ·aspect, it is evident that the act was designed under the grant to the Federal Government in the United States Constitution of power to regulate commerce among the several States and with foreign nations. The power, aside from the question of the manner of the exercise of it, is a plenary power, subject to only two considerations: (1) Is the business, regulated in pursuance of the power, interstate commerce? (2) Is the statute enacted under the power violative of the Fifth Amendment to the Constitution of the United States? The questions as to the form of the legislation, and as to whether the Congress might delegate the power delegated to the President, are not necessarily involved in this motion; nor, so far as the code approved by the President is concerned, is the validity of it as a piece of legislation (provided the method of legislation be approved) under the limitations of the Fifth Amendment to the Constitution of the United States, necessarily involved on this motion. These questions must and will ultimately be passed upon by the Supreme Court of the United States.

The important question here is, whether or not the defendant is engaged in interstate commerce. If it is, then the questions above

noted would be here; if it is not, they are not here. Under the allegations of the complaint, is the defendant engaged in interstate commerce? It sells gasoline to customers appearing at its gas station located in the city of Watertown, N. Y.; it is purely a retailer. Under the ordinary definition of interstate commerce, when a shipment is made from one State to another State, from the time the article shipped starts on its way from the point of production and until it is broken up from the original package in which it was shipped, it would seem that we are in the realm of interstate commerce; but the moment that that package is broken (for example, a carload) and the article of commerce is taken out of its original package for distribution within a State, we are then in the realm of intrastate commerce.

Until now there has never been any legal exercise of Federal power, nor, so far as I know, has there been any decision holding that the interstate commerce clause had any relation whatsoever to production within a State or to distribution within a State, excepting when the article is contained in the original package in which it started out of the State of production.

Like any other retail dealer, the defendant buys its gasoline from the wholesaler in quantities coming in tank cars. Once the product is removed from the tank car and is taken into possession by the retail dealer, it has passed out of the realm of interstate commerce and has come into the realm of intrastate commerce. It is obvious that, on the face of the complaint, the defendant is engaged in intrastate commerce and not in interstate commerce.

There is no allegation in the complaint that the sale of gasoline by the defendant at less than the posted price operated to defeat the regulations affecting interstate commerce; any such allegation would of course be absurd. The Code of Fair Competition for the Petroleum Industry does not attempt to determine or to regulate the price at which a retailer may sell his product; under the code itself he may sell it at any price he may name, provided he posts the price and sells at the posted price. There is no attempt to fix prices. It would be of the utmost absurdity to infer that the sale of gasoline by a retail dealer at any price in any wise affected interstate commerce. In any event, if the plaintiff would raise this question, he owed a duty to allege conduct upon the part of the defendant which constituted interference with the operation of the Federal laws affecting interstate commerce.

Under this phase of the motion, it is also clear that the plaintiff has no standing in court for the reason that, under the National Industrial Recovery Act, the power of enforcement of its provisions, either in equity or in law, resides in the Federal courts, operating

through the United States district attorneys. Were it not for this provision, the courts would be flooded with actions inspired by individuals in every phase of industrial life affected by code provisions. If this were all there were to the action, at this point the duty of the court would be to grant the motion to dismiss the complaint.

But the complaint alleges, at paragraph 5: " Chapter 781 of the Laws of 1933 of the State of New York, provides that the Secretary of State is thereby authorized to receive for filing, and shall file, in the office of the Department of State, a copy of each code in effect pursuant to such act of the Congress, pertaining, affecting or in any way relating to the conduct of business in the state, and duly certified as a true copy of such document. Upon such filing of a copy so certified of a code of fair competition for any trade, industry, or subdivision thereof, as approved by the President of the United States, such code shall be the standard of fair competition for such trade, industry, or sub-division thereof, in the state, as to transactions intrastate in character. The Supreme Court of the State of New York is thereby invested with jurisdiction to prevent and restrain violations of any code of fair competition filed pursuant to said act, and to prevent and restrain the commission within this state of any act tending to defeat or hamper the operation and effectiveness within the state of such act of the Congress, at the instance of any party whose interests are or may be adversely affected by such violations or acts."

Chapter 781 of the Laws of New York of 1933 became effective August 26, 1933. In section 1 it declares the existence of a national emergency, productive of wide-spread unemployment and disorganization of industry, which likewise prevails in the State of New York, which burdens intrastate, interstate and foreign commerce. It refers to the National Industrial Recovery Act and declares that said emergency relates as well to commerce in this State wholly intrastate in character as to interstate and foreign commerce and transactions affecting interstate commerce and foreign commerce carried on in this State. It declares the policy of this State to co-operate in the furtherance of the objects and purposes declared in said act of Congress, and that each and every provision of this act is to be construed in accordance with the policy so declared, " and to make uniform the standards of fair competition prevailing in intrastate commerce and industry with those of interstate commerce required by the provisions of the said national industrial recovery act which are applicable in interstate commerce in the State of New York."

In section 2 it provides that " 1. The secretary of state * * * shall file in the office of the department of state a copy of each code

\* \* \* *in effect pursuant to such act of the congress*, pertaining, affecting or in any way relating to the conduct of business in the state and duly certified as a true copy of such document or documents by the officials in charge of the administration of the provisions of title one of the said national industrial recovery act." (Title 1 includes the pertinent sections hereinbefore referred to.) And said section 2 further provides: " Upon such filing of a copy so certified of a code of fair competition for any trade, industry or subdivision thereof, as approved by the president of the United States, \* \* \* such code \* \* \* shall be the standard of fair competition for such trade or industry or subdivision thereof in the state as to transactions intrastate in character," and that " any violation of any provision of such code \* \* \* shall be a misdemeanor, and upon conviction thereof, the person convicted shall be fined not more than five hundred dollars for each offense, and for each day such violation continues a separate offense subject to the fine herein prescribed shall be deemed to have been committed."

Section 3 thereof provides: " The supreme court of the state of New York is hereby invested with jurisdiction to prevent and restrain violations of any code of fair competition \* \* \* and to prevent and restrain the commission within this state of any act tending to defeat or hamper the operation and effectiveness, within the state, of such act of the congress *at the instance of any party whose interests are or may be adversely affected by such violations or acts."*

Section 5 provides: " While this act is in effect \* \* \*, any code \* \* \* shall be exempt from the provisions of article twenty-two of the general business law \* \* \* to the extent that such provisions of law are inconsistent with the provisions of such code."

This is a unique method of legislation, even assuming, without passing upon, the constitutionality of the National Industrial Recovery Act. The National Industrial Recovery Act does not deal with intrastate commerce, and any part of any code which attempts to deal with intrastate commerce is beyond the power of the President to establish as the law of the land. The provisions of the code applying to interstate commerce, which may or may not be declared the law of the land by the Supreme Court of the United States, have no application to intrastate commerce.

We have already seen that paragraphs 4, 5 and 7 of rule 3, article V of the code are those referring to retailers, and that those paragraphs, in so far as they deal with retailers engaged in intrastate commerce, are beyond the power of the President, under the

authority granted to him by the National Industrial Recovery Act, which relates only to interstate commerce. There are other similar provisions covering the posting of prices and sales at prices posted, referable to those dealing in interstate commerce, to wit, paragraphs 1, 2 and 3 of rule 3, article V, of the Code.

If the Schackno Act, so called, is a valid piece of legislation and there be refiners, distributors, jobbers or wholesalers within the State of New York dealing in interstate commerce, they probably would be bound by the provisions of this code, to the extent that they operated within the State of New York. Of course the Legislature of the State of New York can acquire no power from an act of Congress which it already does not have. The source of its authority is the people of the State. The Legislature of the State of New York has plenary power of legislation, excepting as that power is limited by the Constitution of the State itself or by the provisions of the Fourteenth Amendment to the Federal Constitution. The President having no power to promulgate a code, under the limitations of the National Industrial Recovery Act, affecting intrastate commerce, and the code itself in that respect being in violation of the express provision of the National Industrial Recovery Act, so much of the code as attempts to govern intrastate commerce was void and a nullity; and, therefore, it follows that the provisions of the code under which this action is brought are nonexistent as a part of the law of this State. In other words, in reference to the defendant, a retail dealer within this State, there is no basis for this action.

The intent of the Schackno Act is that codes adopted under the National Industrial Recovery Act shall become a part of the law of this State, and that codes lawfully adopted within the powers granted by the act likewise shall become a part of the law of this State, when filed as provided in the bill.

There is a peculiar inconsistency in the provision of the Schackno Act in that it provides that " Any party whose interests are or may be adversely affected by such violations or acts " may bring an action for injunction in the Supreme Court of the State, whereas title I of the National Industrial Recovery Act, at section 703, subsection (c), provides: " It shall be the duty of the several District Attorneys of the United States, in their respective districts, under the direction of the Attorney-General, to institute proceedings in equity to prevent and restrain violations " of the provisions of codes. And this right under the National Industrial Recovery Act has been held to be exclusive of the right of individuals interested to maintain such actions — and yet the Schackno Act has adopted, as a part of the law of this State, the National Industrial Recovery Act, including this subsection (c) of section 703 thereof.

I presume the Legislature has the power to modify, in so far as it adopts the National Industrial Recovery Act as a part of the law of the State, the provisions thereof, and that, so far as this provision of the Schackno Act is concerned, it was within the power of the Legislature to provide this method of enforcement effectually denied in the National Industrial Recovery Act itself.

But are the plaintiffs, in a legal sense, adversely affected by the alleged conduct of the defendant; and if so, in what respect? These plaintiffs have formed themselves into a voluntary association, for purposes not stated in the complaint. The complaint states that they have a common interest in this cause of action. They are really dealing in regard to price. Unless they are saved by the provisions of the Schackno Act, they are guilty of violating the provisions of article 22 of the General Business Law of this State, as evidenced by the bringing of this action, for they have no other motive in bringing it than this: that they may prevent the defendant from selling gasoline at a price lower than the posted price. They are clearly guilty of violating the laws of this State against agreements in restraint of trade. They allege in their complaint that they have lost and will in the future lose trade in the petroleum business, to their pecuniary damage, and that they will meet with similar damage in the future if the defendant continues its practices, and that serious and irreparable damage will result to the members of plaintiff's association in that they will be required in many instances to sell gasoline at less than the prevailing price in order to meet the unfair competition of the defendant, if the defendant is not restrained by this court from continuing the aforesaid practice of selling petroleum products in any manner which violates said code. In other words, their major premise is based upon the proposition that the defendant is underselling them, and yet the code nowhere attempts to fix the price at which retailers shall sell their goods. According to the complaint, all that the defendant has done of which they do complain is to have posted a price and then to have sold at less than the posted price. This, so far as this court knows, is the first time in the history of this State that any such action has been brought. Ordinarily, actions of this type are brought by or on behalf of some member of the consuming public suffering by reason of monopolistic fixing of prices, and not by those engaged in fixing prices by conspiring together for such purpose, in violation of the law of the land, to prevent a competitor from selling at less than the price which they have conspired to impose upon the public.

While the court is familiar with the facts of the present situation, by reason of the motion made and denied in this very action by the

plaintiff for a temporary injunction, to the effect that these parties have posted a price of eighteen and one-half cents per gallon for gasoline, while the defendant has posted a price of seventeen cents per gallon, and it is difficult to discharge this fact from one's mind in the consideration of this phase of the present motion, nevertheless the court is bound, on this motion, by the allegations of the complaint. But the very action itself is pregnant with the purpose to prosecute this defendant because it is selling gasoline at lower prices than the plaintiffs are selling it, either by mutual agreement or imposed upon them by wholesalers. Under the guise of an allegation that the defendant is selling gasoline at less than the posted price, they are really pursuing the defendant because it is selling gasoline to the public at a price cheaper than they are able to or willing to sell it.

Rule 4 of article V of the code provides as follows: " Refiners, distributors, jobbers, wholesalers, *retailers* and others engaged in the sale of petroleum shall not sell any such refined petroleum products below cost of manufacturing or importation into the state where offered for sale, plus reasonable expenses in the cost of marketing as observed under prudent management, fixed taxes and inspection fees by the Federal or State government, or any political sub-division thereof, provided, however, that any person is permitted to meet competition in violation of this rule concerning which he has made complaint to the Planning and Coordination Committee, or any authorized agency thereof, but only pending action thereon." Such rule 4 of article V provides the remedy as follows: " An authority, committee or commission delegated by the National Recovery administration for such purposes shall receive complaints of violation of this rule and make such investigation and/or hold such hearings as it deems necessary to determine whether the prices complained of are in violation of this rule."

There is no allegation in the complaint that the defendant is not selling at a fair profit, or that he is selling below his cost of sale, including the purchase price, the tax and the cost of operation. As already pointed out, there is no allegation that what the defendant is doing has any effect upon interstate commerce. Are they, under these circumstances, in any position to maintain an action in equity to restrain an ordinarily lawful act on the part of the defendant? Ordinarily, when one comes into a court of equity he must come with clean hands; and certainly one with a monopolistic brand upon him cannot be deemed to be in that class. If my conclusions are correct, the plaintiffs, the code being stripped of the provisions adopted as to retail trade in intrastate commerce, in

violation of the express provisions of the National Industrial Recovery Act, have of course no standing in court, as a matter of law.

But, aside from this, the motion is made for a dismissal of this complaint on the further ground that the Schackno Act is unconstitutional in that the Legislature has no power to delegate to the President of the United States the power to legislate within the the State of New York. The Constitution of the State of New York, article III, section 1, provides: " The legislative power of this State shall be vested in the Senate and Assembly." Having so vested it, it has been uniformly held that they have no power to divest it, even to the people themselves. In other words, the Constitution of the State of New York created a representative form of government, and, for purposes of legislation, the people of the State made the Senate and Assembly, elected by them, their representatives for the purposes of legislation. (*People ex rel. Simon* v. *Bradley*, 207 N. Y. 592.) Certain limitations upon this power have been noted.

In *People ex rel. Unger* v. *Kennedy* (207 N. Y. 533) the Court of Appeals well said: " The proposition that by our Constitution general powers of legislation are conferred exclusively upon the legislature, and that this body may not escape its duties and responsibilities by delegating such legislative powers to the people at large, must be regarded as so thoroughly established that it needs no discussion."

Now this subject of the power of the Legislature of the State of New York to delegate legislative power has been the subject of much consideration by the courts of this State. It has been said that, while the question of the expediency of an act, or of its operation, cannot be delegated, the Legislature may pass an act the operation of which in particular instances is dependent on or affected by a future contingency. (*People* v. *Long Island R. R. Co.*, 134 N. Y. 506.) It has also been held that the Legislature may delegate to the electors of a restricted locality to determine whether a completed enactment passed by the Legislature shall become operative or shall be taken advantage of. (*People ex rel. Unger* v. *Kennedy, supra; Stanton* v. *Board of Supervisors*, 191 N. Y. 428.) Here there were completed pieces of legislation applicable to a locality, and the court held that giving the people of the locality the right to vote as to whether this particular piece of legislation should be operative upon them did not constitute a delegation of legislative power. It has been the uniform practice for the Legislature to confer upon municipalities of the State the authority to enact and enforce ordinances to execute and carry into operation the powers granted. (*City of Buffalo* v. *Stevenson*, 207 N. Y. 258.) It has been

held that the Legislature may confer upon boards of health the power to enact sanitary ordinances. (*Bellows* v. *Raynor,* 207 N. Y. 389.) One of the most interesting cases on the subject arose in reference to a grant of power to a Public Service Commission to fix maximum rates to be charged by public service corporations. This was, on its face, such a delegation of legislative power that the matter was given voluminous consideration by our Court of Appeals in the case of *Village of Saratoga Springs* v. *Saratoga Gas & Power Co.* (191 N. Y. 123). And the question was again considered in the case of *People ex rel. C. P., etc., R. R. Co.* v. *Willcox* (194 N. Y. 383). Stripped of all learned discussion on the subject, it came down to this: That while the Legislature had the undoubted power, subject to the limitations of the Fourteenth Amendment to the Federal Constitution, to fix rates, it also had the power to enact that there should be maximum rates fixed and to provide that the Public Service Commission, after full hearing, could fix a reasonable maximum rate. The decision rather turned on the practicalities of the situation. There are hundreds of municipalities in this State with different conditions and circumstances, with public service corporations serving them under peculiar and different states of fact and law, to such an extent that it is utterly impracticable for the Legislature to legislate in each particular case; and the Court of Appeals held that giving the Public Service Commission, under the restrictions contained in the legislation, the power to fix reasonable maximum rates did not constitute an unlawful delegation of legislative power.

There are other instances of apparent delegation of power to make regulations, as in the Education Department; but in every instance the law itself is declared by the act of the Legislature, and the regulations must follow within the law and are really details in administration of the law, rather than delegations of power to make a law. The decisions of the courts in this State are unanimous upon the proposition that the Legislature of the State may not delegate its power to legislate to any one.

The instances above noted where this has apparently been done by the Legislature, and the acts sustained by the courts, are not true instances of delegation of power to legislate; they are cases where the law has been declared by the Legislature, and the regulations are either purely administrative in character or, as possibly in the instance of the Public Service Commission, quasi-judicial and subject to review at all times by the courts as to whether (1) the regulations are within the law, and (2) whether they are reasonable or operate in violation of the Bill of Rights in the State Constitution or the Fourteenth Amendment to the Federal Constitution. Even in going the little way that the Court of Appeals

has gone in this matter, it has expressed the view that, while the Legislature itself could have adopted these regulations (and, to that extent, there was an apparent delegation of legislative power), where the Legislature had set up a standard of action or had declared a principle of law and then authorized a public ·body to make regulations to carry it out, these regulations were really administrative in character. The court has realized the point where representative government ends and bureaucracy begins.

It will be noted that whatever delegation of legislative power for administrative purposes has been allowed has been allowed to public bodies set up by the Legislature of this State. A prime illustration of it is the creation of municipalities, with a definition of their powers, with an authorization to pass ordinances to make effective in the community the powers granted. The act creating the municipality was a completed act. As in other instances where there are so many different conditions applying to different communities, and different methods of executing powers granted, it would be a practical impossibility for the Legislature to make specific rules and regulations denominated as municipal ordinances to enforce the powers granted to a municipality. And that is true of other administrative or quasi-judicial bodies created by the Legislature.

In the present instance we have an entirely different situation. The Schackno Act delegates a power to legislate, not to any agency of the State created by it, but to a foreign agency which in its nature has no powers of legislation excepting the power to veto congressional bills, to wit, the President of the United States. Under the National Industrial Recovery Act, the President is given the power to do three things: (1) To approve codes prepared by the representatives of an industry or industries engaged in interstate commerce, subject to the limitations heretofore noted; (2) of his own motion, if complaint is made to him that practices inimical to the public interests and contrary to the policy declared in the act are prevalent in any trade or industry, and if no code of fair competition has been approved, after public notice and hearing to prescribe and approve a code of fair competition for such trade or industry, which shall have the same effect as a code of fair competition approved by the President under subsection (a) of this section [§ 703, subsection (a), N. I. R. A.]; (3) to enter into agreements with and approve voluntary agreements between and among persons engaged in trade or industry, labor organizations, etc., if in his judgment such agreements will aid in effectuating the policy of this chapter with respect to transactions in or affecting interstate or foreign commerce and will be consistent with the

requirements of clause (2), subsection (a) of section 703 for a code of fair competition. If, under the State Constitution, this same power had been delegated to the Governor of the State, then we would have had the issue as to whether or not the powers delegated did amount to a delegation of legislative power contrary to the decisions of the Court of Appeals and in violation of the provisions of the State Constitution, and the issue then would be whether or not the legislation amounted to an actual delegation of power, as distinguished from the establishment of rules for carrying into operation a power granted by the Legislature. There can be no doubt that, on constitutional grounds, the Legislature has no power to delegate powers of legislation, and in no event to a non-state-created agency. I must, therefore, hold that the attempt to do this, as set forth in the Schackno Act, is beyond the power of the Legislature.

It is urged that this is emergency legislation. The question, of course, as to whether there is an emergency is a question of fact, and it is assumed that, so far as the purposes of the court are concerned, the declaration of the Legislature is sufficient evidence of the fact; but an emergency never awakened into existence a non-existing power. The power to declare war exists in Congress, and of course war creates an emergency, and legislation under the power which otherwise might be declared to be unconstitutional will perhaps be sustained, within proper limits, under the war power. Great catastrophies, such as flood, drought, earthquake, or questions of public health, seriously affecting the welfare of the country, under the Federal Constitution lay the foundation for the expenditure of public funds to relieve the catastrophe; and this of course applies, within proper limits, to such a calamity as the depression through which we are passing, where the public welfare is involved. (U. S. Const. art. 1, § 8.)

Under the commerce clause, which grants to Congress the power to " regulate commerce with foreign Nations and among the several States," the power of Congress is plenary to the extent that legislation is directed to that end.

There is no power, nor has there been any decision which recognizes a power in Congress, to fix prices, either of labor or commodities. There is one case where price-fixing has been approved, and that is the case of *Wilson* v. *New* (243 U. S. 332), which is a very interesting decision. As will be recalled, we were threatened in this country with a general strike on all the railroads of the United States; the railroads could not agree with their employees as to what wages would be paid. In the emergency, Congress passed a law temporarily establishing a standard of wages, pending

a final agreement on the subject between the railroads and their employees, in order that commerce might continue. The issue in that case was whether Congress had the right to do that. Generally speaking, the right was denied by the Supreme Court of the United States in that case, excepting on account of an emergency which meant the total destruction of interstate commerce — and then only temporarily, until wages could be established by agreement. The force of this decision of course must be limited to the state of facts involved. In that case the court held that an emergency did not create a power, that the power must exist apart from the emergency, and that, existing, the emergency might awaken the exercise of the power. That was an extreme case. The power never existed in Congress, under the United States Constitution, to deal with intrastate commerce; and, never existing, no emergency can awaken the exercise of it.

By analogy, there is no power in the Legislature of the State of New York to delegate any of its legislative powers to any outside agency, as to the Federal government or to the President of the United States. To do so is to impair the sovereignty of the State itself. The source of authority in State government is the people of the State; and, because our State governments were in existence at the time of the Revolution, it has been generally assumed, and is the accepted judicial view, that the Legislature in a State has plenary law-making power, excepting as it has been limited by the express provisions of the State Constitution or by the Fourteenth Amendment to the United States Constitution. With these exceptions, the Legislature has plenary power and as to its acts there is no question of constitutionality involved.

Not so, however, with the Federal government: it has such powers, and only such powers, as are delegated to it by the Constitution directly or by necessary implication; all other powers are reserved to the States or the people.

If Congress had delegated to the President the power to legislate in reference to intrastate commerce, such power would be a nullity, as beyond the powers of Congress.

In the instant case, under the National Industrial Recovery Act the Congress made no attempt to deal with intrastate commerce; it only dealt with interstate commerce. If there is any dealing with intrastate commerce in the code under question, it is by reason of the act of the industrial associations and the President, or the President alone, without any power derived from the National Industrial Recovery Act. So that we have, in the present instance, in so far as the code has any application to intrastate commerce, the act of an individual, outside of his powers as President of the

United States; and the Legislature of the State of New York, under the Schackno Act, has attempted to delegate to that individual its powers of legislation. This is beyond its power to do. If the Legislature had delegated to the Governor of this State the powers that it has delegated in the Schackno Act to the President of the United States in reference to intrastate commerce in the same form that it made that delegation to the President of the United States, I do not believe that such delegation would be sustained as being within the power of the Legislature, in the absence of the setting up of a standard of fair competition, leaving only to the Governor or any other State body or agency the power to make rules to carry into execution the powers delegated.

In the Code of Fair Competition for the Petroleum Industry, at rule 4 of article V thereof, there is set up a standard of fair competition, as hereinbefore noted. Here is an attempt to set up a standard of fair competition, and an agency is created with the power to establish regulations to carry into effect the law designed to maintain such a standard; and, under the present circumstances, it may well be that the legislation by the State Legislature to the same effect, set forth in the act, would be sustained as a proper exercise of legislative power and not an unauthorized delegation of legislative power — subject, however, as to its actual operation in any particular case, to the limitations of the State Constitution and of the Fourteenth Amendment to the Constitution of the United States.

We have heretofore considered the Schackno Act upon its merits. There is in the State Constitution a provision which expressly denies to the Legislature the power to legislate by reference. Article III, section 17, of this Constitution provides: " No act shall be passed which shall provide that any existing law, or any part thereof, shall be made or deemed a part of said act, or which shall enact that any existing law, or part thereof, shall be applicable, except by inserting it in such act." This provision has been for many years in the Constitution of this State. The evils sought to be avoided by it are well set forth in the case of *People ex rel. Commissioners* v. *Banks* (67 N. Y. 568). I am of the opinion that this provision is effective to cover an act of Congress or the codes adopted in pursuance thereof. The codes, once approved, are designed to have the effect of law. The State Legislature, by this section, is prohibited from legislating in the manner in which it has legislated in chapter 781 of the Laws of 1933, in so far as it attempts to provide that the National Industrial Recovery Act shall be the law of this State by mere reference to the act; and this of course applies to the codes adopted thereunder. The National Industrial Recov-

ery Act was an existing law, to be sure, of Congress; but if the Legislature is prohibited from making an existing law of the State a part of an act by mere reference, how much more should the provision apply to an existing law of the United States or of any other State in the Union? And this would apply alike to codes adopted in pursuance of an existing Federal law. For this reason, if for no other, the Schackno Act, in so far as it incorporates by reference the National Industrial Recovery Act and makes it, by mere reference, a part of the Schackno Act, is void, in that it constitutes an attempt to legislate in a manner prohibited by section 17 of article III of the State Constitution. And this principle with greater force would apply to legislation which would incorporate as a part of the law of the State of New York any future law which Congress might enact or which any agency named by Congress might in the future promulgate in the form of a code.

Therefore, so far as the plaintiff bases any right upon the so-called Schackno Act (Laws of 1933, chap. 781) the complaint must fall.

Attention is called to the fact that in the present instance we are not dealing with a case where a party has voluntarily entered into an agreement or made a contract with the President of the United States as to how he shall conduct himself as to the administration of his business. There is no such allegation in the complaint. Such agreements are to be considered as in a different category.

The National Industrial Recovery Act legislates as to matters clearly within the powers of Congress, because the effect of it and the purpose of it was, during the emergency, to relieve industry from the fetters which it was claimed were holding it down, as set forth in the Federal anti-monopoly laws. The main question affecting the constitutionality of that act is, whether or not it constitutes in any respect an unconstitutional delegation of the power of Congress to legislate. The weakness of the act itself lies in the fact that it does not set up any standard of fair competition, but delegates that power to the President. Does this constitute an unauthorized delegation of the power of Congress to make laws? That is for the Supreme Court of the United States to determine. That question is not necessarily here, and is, therefore, not considered.

The motion to dismiss the complaint should be granted for the foregoing reasons, with costs.

Ordered accordingly.