LOUIS SMITHBERGER ET AL., PLAINTIFFS, V. WILLIAM B. BANNING ET AL., DEFENDANTS: NEBRASKA PETROLEUM MARKETERS, INC., ET AL., INTERVENERS.

FILED SEPTEMBER 20, 1935. No. 29603.

*Fay H. Pollock, Wilber S. Aten, John P. McKnight, H. G. Burke, Elmer Rakow, G. J. McGinley, E. Gudmundsen, W. E. Mumby, Erwin A. Jones, Emil J. Eret, Ralph J. Nickerson, Paul R. Morris, Ray E. Sabata, Ted R. Frogge, W. G. Kieck, Elbert H. Smith, Lloyd L. Pospishil, Charles H. Hood* and *Burr R. Davis,* for plaintiffs.

*William H. Wright, Attorney General, Milton C. Murphy, Sterling F. Mutz* and *Lester A. Danielson,* for defendants.

*Lee Basye,* for interveners.

Heard before Goss, C. J., Rose, Good, Eberly, Day, Paine and Carter, JJ.

Carter, J.

This is an original action by which certain taxpayers seek an adjudication of the constitutionality of the emergency relief measures enacted by the fiftieth session of the Nebraska legislature, which measures are known as Senate File No. 363, House Roll No. 432, House Roll No. 675, and Senate File No. 367, the same being companion acts creating a state assistance committee and providing for the raising of funds to be used for the relief of the unemployed, old age pensions, and for other purposes therein described. The Nebraska Petroleum Marketers, Inc., intervened in behalf of the members of such association and all other persons similarly situated. Calvin J. Stover, a gasoline dealer and a taxpayer who is required to pay the one-cent additional gasoline tax, as provided by Senate File No. 363, also intervened in behalf of himself and all others similarly situated. The case is presented and submitted on the general demurrers of the defendants to the petition of plaintiffs and the petitions of intervention of the interveners.

Senate File No. 363, as amended by House Roll No. 432, imposes a one-cent motor vehicle fuel tax, in addition to the previous four-cent gasoline tax, for emergency relief purposes, said tax to be collected from March 1, 1935, to June 30, 1936. The act provides in part as follows: "For assistance to its citizens who are eligible under federal legislation to work relief, direct relief, old age assistance, assistance to dependent mothers and children, unemployment insurance, health of mothers and children, public health or related matters of security and welfare, and public works, especially roads, by the use of work relief."

House Roll No. 675, as amended by Senate File No. 367, appropriated $300,000 of the state general fund, $700,000 of liquor license fees and $3,000,000 from the emergency motor vehicle fuels tax, and provides governmental ma-

chinery for the distribution of the funds, consisting of the state assistance committee, an administrative board, co-ordinating with the board of educational lands and funds of the state of Nebraska, a trustee of the state assistance fund. Section 13 of House Roll No. 675 provides in part: "Such grants by the state assistance committee shall be made in proportion to the need of such counties and other governmental subdivisions for assistance, when, after reasonable effort, they are unable to furnish necessary and adequate assistance for dependent persons."

The acts of the legislature under consideration designate many classes of emergency and permanent relief and provide that preference should be given for matching federal funds for old age assistance, without any directions or limitations for allocating funds for any of those purposes and without any basis for the determination of the need.

In order to make a county eligible for federal relief, under the rules promulgated by the federal relief administration, the county must provide for its road and bridge funds an amount equal to 25 per cent. of its gasoline tax income for such purpose, and, in addition thereto, levy 1.93 mills of the 1934 assessed valuation for relief purposes, and certain other relief levies not material to this action. It is contended by plaintiffs, and admitted by defendants' demurrer, that certain counties of Nebraska are already making the maximum levies permitted by the Constitution and they are therefore precluded from making the required levy for the matching of federal funds for relief purposes. In certain other counties the relief load has been borne by the counties themselves by levying less than the 1.93 mills required by the federal relief administration and hence they also are ineligible for federal relief.

At the date of the filing of the petition, the congress of the United States had not passed any law providing for old age assistance, public security, health and welfare. It is also admitted by the pleadings that there are distressed and needy persons in all counties of the state of Nebraska within each and all the classifications contained in the acts

in question, and particularly within the 23 counties above mentioned which are not eligible for federal relief.

The plaintiffs contend that the laws in question are unconstitutional for the following reasons: (1) That the acts delegate legislative powers to the congress of the United States and to the executive branch of the state government and therefore violate section 1, art. II, and section 1, art. III of the Constitution; (2) that the acts are not for a general or public purpose, for the reason that the benefits are not state-wide in their scope and do not affect all needy persons of the state in the same class, and therefore violate section 3, art. I of the Nebraska Constitution, and the Fourteenth Amendment of the federal Constitution; and (3) that the acts are broader than their respective titles and therefore violate section 14, art. III of the Nebraska Constitution.

The first question to be determined is whether the legislature has delegated legislative authority to the congress of the United States or to the state assistance committee. If so, the act contravenes section 1, art. II, and section 1, art. III of the Constitution of Nebraska.

Senate File No. 363, as amended by House Roll No. 432, provides in part as follows: "An additional tax of one cent per gallon upon all motor fuels received, imported and unloaded and emptied, * * * and produced, refined, manufactured or compounded by such dealer in the state of Nebraska shall be remitted to the department of agriculture and inspection * * * commencing March 1, 1935, and ending June 30, 1936, shall be credited and shall inure to the state assistance fund, and during said period shall be expended under the general direction of the board of educational lands and funds, advising and counseling with the state assistance committee, solely for assistance to worthy indigent poor persons throughout the several counties in such sum as the board of educational lands and funds shall allocate from time to time during said period and the sums so allocated to be administered by the county boards of the several counties cooperating with such welfare agencies as

provided by law. * * * In passing subsection (b) of this act it is the intention of the legislature that all motor vehicle fuels tax money accruing and in the hands of the state treasurer subsequent to twelve o'clock midnight, June 30, 1936, arising out of the provisions of subsection (a) of this section shall be used and employed as provided in subsection (a) of this section. It is hereby declared that the provisions of subsection (b) of this section are made necessary by emergencies arising out of the present economic crisis, pursuant to requirements of the United States of America that the state of Nebraska and its several counties contribute not less than four million dollars per annum for assistance to its citizens who are eligible under federal legislation to work relief, direct relief, old age assistance, assistance to dependent mothers and children, unemployment insurance, health of mothers and children, public health or related matters of security and welfare, and public works, especially roads, by the use of work relief labor; and in order to relieve conditions which make it impossible for counties properly and necessarily to assist worthy persons by the issuance of anticipatory warrants against the general funds of the several counties until on or before August 1, 1935."

Section 73 of House Roll No. 381, the general appropriation bill, appropriates $4,000,000 to the state assistance committee. There is no provision in any of the bills mentioned that fixes any standards for the guidance of the state assistance committee or the board of educational lands and funds. The committee and board above mentioned have an arbitrary and unrestricted discretion to allocate the $4,000,000 to any of the purposes set forth in the acts under consideration, with the single exception that old age pensions are to be given a preference. Under these acts, the board and committee have the power, if they see fit to do so, to allocate the whole fund to the payment of old age pensions and unemployment insurance without the requirement of the making of any findings of fact under standards and tests provided for in the act. Such provi-

sions amount to a delegation of legislative power. Under section 1, art. II, and section 1, art. III of the Nebraska Constitution, the legislative power of the state is vested in the legislature and cannot lawfully be delegated to any board or committee. Such provisions deny the equal protection of the law and violate the due process provisions of the Fourteenth Amendment to the federal Constitution.

In the case of *Investors Syndicate v. Bryan,* 113 Neb. 816, this court said:

"Plaintiff earnestly contends that the above sections of the statute are void because they vest in an administrative board absolute, unregulated, and undefined discretion to grant or withhold its certificate of approval under general statutory language, which fixes no standards or tests to which an applicant may knowingly conform, and from which it can be determined whether corporations, transacting precisely the same kind and character of business, have been or may be dealt with equally; that the statute attempts to vest in an administrative board absolute and arbitrary power to say which, if any, of two or more companies, proposing to transact the same kind of business in the same manner and under like conditions, may be permitted so to do in the state of Nebraska.

"If the statutes, when properly construed, grant or attempt to grant to an administrative board such unrestricted and arbitrary discretion as plaintiff contends they do, then we will be compelled to hold that they are void because violative of both state and federal constitutional provisions. They would deny the equal protection of the law and violate the due process provisions of the Fourteenth Amendment to the federal Constitution. They would then fall within the class of statutes and ordinances that are condemned in *Yick Wo v. Hopkins,* 118 U. S. 356; *Tai Kee v. Minister of Interior,* 12 Hawaiian Rep. 164; *State v. Superior Court,* 113 Wash. 296; *City of Richmond v. Dudley,* 129 Ind. 112; *City of Seattle v. Gibson,* 96 Wash. 425; *Bear v. City of Cedar Rapids,* 147 Ia. 341; *Hewitt v. State Board of Medical Examiners,* 148 Cal. 590, 3 L. R. A. n. s. 896."

Clearly, in the case at bar, the purposes, for which the fund of $4,000,000 was to be expended, were to be determined by the state assistance committee and the board of educational lands and funds. This is a duty of the legislature that cannot be delegated. In the case of *People v. Brady,* 277 Ill. 124, the court said: "The General Assembly must determine to what objects and purposes money of the state shall be appropriated, and cannot bestow that power upon any person or board for the exercise of discretion of the donee as to the objects for which the money shall be expended." Also, in *People v. Belcastro,* 356 Ill. 144, the court said: "If the legislature leaves to administrative officers the determination of what the law shall be, or to determine what acts are necessary to effectuate the law, such delegation of authority is void. 1 Sutherland on Stat. Const. (2d ed.) p. 148."

In *Panama Refining Co. v. Ryan,* 293 U. S. 388, Chief Justice Hughes, in discussing the question of the delegation of legislative power by congress to the president of the United States, said: "It does not attempt to control the production of petroleum and petroleum products within a state. It does not seek to lay down rules for the guidance of state legislatures or state officers. It leaves to the states and to their constituted authorities the determination of what production shall be permitted. It does not qualify the president's authority by reference to the basis or extent of the state's limitation of production. Section 9 (c) does not state whether or in what circumstances or under what conditions the president is to prohibit the transportation of the amount of petroleum or petroleum products produced in excess of the state's permission. It establishes no criterion to govern the president's course. It does not require any finding by the president as a condition of his action. The congress in section 9 (c) thus declares no policy as to the transportation of the excess production. So far as this section is concerned, it gives to the president an unlimited authority to determine the policy and to lay down the prohibition, or not to lay it down, as he may see

fit. * * * The congress did not declare in what circumstances that transportation should be forbidden, or require the president to make any determination as to any facts or circumstances. Among the numerous and diverse objectives broadly stated, the president was not required to choose. The president was not required to ascertain and proclaim the conditions prevailing in the industry which made the prohibition necessary. The congress left the matter to the president without standard or rule, to be dealt with as he pleased. The effort by ingenious and diligent construction to supply a criterion still permits such a breadth of authorized action as essentially to commit to the president the functions of a legislature rather than those of an executive or administrative officer executing a declared legislative policy. * * * The question whether such a delegation of legislative power is permitted by the Constitution is not answered by the argument that it should be assumed that the president has acted, and will act, for what he believes to be the public good. The point is not one of motives, but of constitutional authority, for which the best of motives is not a substitute. While the present controversy relates to a delegation to the president, the basic question has a much wider application."

In *A. L. A. Schechter Poultry Corporation v. United States,* 55 Sup. Ct. Rep. 837, Chief Justice Hughes said: "We pointed out in the *Panama Refining Company* case that the Constitution has never been regarded as denying to congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply. But we said that the constant recognition of the necessity and validity of such provisions, and the wide range of administrative authority which has been developed by means of them, cannot be allowed to obscure the limitations of the authority to delegate, if our constitu-

tional system is to be maintained. *Id.*, 293 U. S. 388, page 421. * * * To summarize and conclude upon this point: Section 3 of the Recovery Act (15 U. S. C. A. sec. 703) is without precedent. It supplies no standards for any trade, industry, or activity. It does not undertake to prescribe rules of conduct to be applied to particular states of fact determined by appropriate administrative procedure. Instead of prescribing rules of conduct, it authorizes the making of Codes to prescribe them. For that legislative undertaking, section 3 sets up no standards, aside from the statement of the general aims of rehabilitation, correction, and expansion described in section 1. In view of the scope of that broad declaration and of the nature of the few restrictions that are imposed, the discretion of the president in approving or prescribing Codes, and thus enacting laws for the government of trade and industry throughout the country, is virtually unfettered. We think that the Code-making authority thus conferred is an unconstitutional delegation of legislative power."

The above cases have particular application in principle to the case at bar. In the Nebraska acts, there are no limitations, standards, rules of guidance or criterion for the guidance of the state assistance committee and the board of educational lands and funds in allocating funds for old age assistance, unemployment relief, mothers' health, unemployment insurance, and other forms of relief therein enumerated. There is no requirement that the administrators of the acts find certain facts in determining for which of the various purposes allocations should be made and no basis for determining the amount to be allocated to each or any of the purposes therein set forth. This is all left to the discretion of the state assistance committee. Under the authorities hereinbefore cited, this constitutes a delegation of legislative functions to an administrative board.

It will also be noted that section 12 of House Roll No. 675, as amended by section 2 of Senate File No. 367, provides: "Assent is hereby given to the provisions of an act

of congress (H. R. 7260), now pending and as finally adopted entitled 'An act to provide for the general welfare by establishing a system of federal old-age benefits, and by enabling the several states to make more adequate provisions for aged persons, and for other purposes;' and the good faith of the state of Nebraska is hereby pledged to provide funds sufficient to carry out the provisions of said act of congress as hereinafter provided." The petition of plaintiffs alleges, and the demurrer admits, that the above act of congress had not been passed by the congress when the Nebraska acts under consideration became laws, nor had it been passed when plaintiffs' petition was filed. The contention is made that this is an unconstitutional delegation of legislative power to the congress of the United States.

In *Opinion of the Justices*, 239 Mass. 606, that court said:

"It is attempted by these sections and possibly by other sections to make the substantive law of the commonwealth in these particulars change automatically so as to conform to new enactments from time to time made by congress and new regulations issued pursuant to their authority by subsidiary executive or administrative officers of the United States. It purports to create offenses and impose punishments therefor, not by definition and declaration, but by reference to what may hereafter be done in these particulars by the congress of the United States and those by it authorized to establish regulations.

"We are of opinion that legislation of that nature would be contrary to the Constitution of this commonwealth. Legislative power is vested exclusively in the general court except so far as modified by the initiative and referendum amendment. It is a power which cannot be surrendered or delegated or performed by any other agency. The enactment of laws is one of the high prerogatives of a sovereign power. It would be destructive of fundamental conceptions of government through republican institutions for the representatives of the people to abdicate their exclusive

privilege and obligation to enact laws. *Boston v. Chelsea,* 212 Mass. 127; *Opinion of the Justices,* 160 Mass. 586; *Knickerbocker Ice Co. v. Stewart,* 253 U. S. 149."

In *Cline v. Consumers Cooperative Gas & Oil Co.,* 274 N. Y. Supp. 362, 383, the court said, in considering a like question: "By analogy, there is no power in the legislature of the state of New York to delegate any of its legislative powers to any outside agency, as to the federal government or to the president of the United States. To do so is to impair the sovereignty of the state itself."

In *Darweger v. Staats,* 275 N. Y. Supp. 394, 401, the court said:

"The Schackno act does more than merely declare a policy and provide means to carry it into effect. The NIRA is not adopted, but it is declared to be the policy of the state of New York to conform in intrastate commerce and transactions with its purpose and administration. Codes adopted under the NIRA are made, though not in existence, by reference those of the state of New York. The act adopts not a law of the congress, but a body of rules and regulations prepared by individuals, approved by an administrative authority and finally approved by the president, and then provides that, upon filing a certified copy in the office of the secretary of state, a violation of any provision of such Code so adopted and filed is a crime under the laws of the state of New York. To term such a method of legislation, such a manner of attempting to create criminal offenses, vicious is to indulge in mild criticism. To hold such a legislative act constitutional seems contrary to the plain language and import of our fundamental laws, both national and state. * * * The legislature cannot delegate the sovereign powers of the state to an administrative or executive authority of a foreign jurisdiction. It cannot surrender the sovereignty of the state to declare the acts constituting a crime to federal executive or administrative authority.

" 'The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved

to the states respectively, or to the people.' U. S. Const. 10th Amendment.

"It seems to us, without attempting to enter into an extended analysis or discussion, that such a statute is violative of the provisions of the Constitution of the state of New York above referred to, as well as contrary to every principle upon which our republican institutions are based."

In affirming the above case, the court of appeals of New York said: "The state legislature cannot leave to congress to determine that an emergency exists in intrastate business in the state of New York, and we may say in passing, that congress has not attempted to do so. The legislature cannot leave to a body of industrials throughout the United States to declare that an emergency exists here in intrastate business, and to provide methods and means for meeting that emergency. * * * Even then the legislature in this case has made no attempt to fix the price of coal or to appoint anybody to investigate as to its necessity. It adopts without ascertaining the facts for itself what may or may not be done by others having interests outside of New York state. * * * We conclude that this state law which we are reviewing is unconstitutional, as an unauthorized delegation of legislative functions, contrary to our state Constitution." *Darweger v. Staats*, 267 N. Y. 290.

Senate File No. 363, as amended by House Roll No. 432, levies a one-cent a gallon tax on all motor vehicle fuels in addition to the tax of four cents a gallon already levied. The taxes thus collected, in the words of the statute, "shall be credited and shall inure to the state assistance fund." The statute further states: "The temporary regulations contained in subsection (b) are designed to promote public convenience as well as the general welfare and prosperity to meet an emergency which the legislature deems of immediate importance since the United States of America requires that legislation on the part of the state of Nebraska to raise said four million dollars annually be enacted prior to March 1, 1935: Provided, that the authority

is hereby given the governor of the state of Nebraska to terminate this tax by executive order when the full amount appropriated has been raised or when he is satisfied the full amount appropriated, or so much thereof as may be necessary, will be raised from funds appropriated for relief purposes as now or hereafter provided." As we have heretofore mentioned, the federal legislation referred to has not been passed. The amount of taxes to be derived from the tax was therefore left as an uncertain amount. Apparently the legislature realized that the federal legislation might carry an appropriation of funds for Nebraska in a sum less than the $4,000,000 provided for in the statute. In order to prevent the collection of an amount in excess of the sum made available by the federal government to match state appropriations for relief, public works, etc., the governor was given power to terminate the tax by executive order "when the full amount appropriated has been raised or when he is satisfied the full amount appropriated, or so much thereof as may be necessary, will be raised from funds appropriated for relief purposes as now or hereafter provided." As we have herein determined, this set of facts constitutes a delegation of legislative power to the congress of the United States. The power to determine the amount to be raised by the tax is dependent upon federal legislation not yet passed.

It is true that the governor is directed under a certain state of facts to terminate the tax. When the full amount appropriated or so much thereof as is required has been collected, the governor is authorized so to act. But, in order to make such a determination, he must await the action of the federal congress which was authorized to fix the amount to be appropriated for relief, etc., in Nebraska. There is a great difference in authorizing the governor to terminate a tax when the amount appropriated has been collected and in having the governor determine the amount to be appropriated from facts not in existence when the act was passed, and terminating the tax when that amount has been collected.

The elimination of the invalid provisions of the legislative acts under consideration and the elimination of the invalid appropriation contained in the statutes leave entirely different statutes from those which were passed by the legislature, so that it cannot be said it would have passed the acts without said void provisions, and the acts must therefore be held void in their entirety. The rule was well stated by a prominent text-writer as follows: "And if they are so mutually connected with and dependent on each other, as conditions, considerations, or compensations for each other, as to warrant the belief that the legislature intended them as a whole, and if all could not be carried into effect the legislature would not pass the residue independently, then if some parts are unconstitutional, all of the provisions which are then dependent, conditional, or connected must fall with them." 1 Cooley, Constitutional Limitations (8th ed.) 362. This court has held: "Where valid and invalid parts of a legislative act are so intermingled that they cannot be separated in such a manner as to have an enforceable statute expressing the legislative will, no part of the enactment can be enforced." *State v. Junkin*, 85 Neb. 1. Also, in *Searle v. Yensen*, 118 Neb. 835, this court said: "Sections 3 and 4, ch. 108, Laws 1927, are unconstitutional, as an attempt to impose upon the courts the performance of nonjudicial duties, and an unlawful delegation of legislative power; and such sections being a part of the inducement for the enactment, the entire act must fall." In *Moeller, McPherrin & Judd v. Smith*, 127 Neb. 424, this court announced the rule as follows: "When sections of a legislative act are unconstitutional, and such sections were an inducement to the passage of an act in its entirety, then the entire act is void, notwithstanding a saving clause therein." After resolving all doubts in favor of the validity of the acts in question, yet with the eliminations stated, the remaining parts are not the acts the legislature passed or intended to pass, and hence the acts under review, wholly and entirely, are void.

We conclude, therefore, that Senate File No. 363, as

amended by House Roll No. 432, violates section 1, art. II, and section 1, art. III of the Nebraska Constitution, for the reason that the state assistance committee and the board of educational lands and funds have been delegated legislative powers therein which violate the provisions of the Constitution mentioned. We hold further that House Roll No. 675, as amended by Senate File No. 367, violates section 1, art. II, and section 1, art. III of the Nebraska Constitution, for the reason that the congress of the United States has been delegated legislative powers by the terms of these acts which violate the provisions mentioned of the Constitution of Nebraska.

In view of the fact that the acts under consideration are nullities, it is not necessary that the other contentions of plaintiffs and interveners be considered.

We therefore hold that the demurrers of the defendants to plaintiffs' petition and to the petitions in intervention should be and hereby are overruled.

JUDGMENT ACCORDINGLY.

PAINE, J., concurring.

I concur in the opinion adopted by the court. In addition to the discussion of the attempt to delegate legislative powers to an administrative board and to the congress of the United States, as set out in the main opinion, I desire to emphasize another phase of the attempted legislation.

While certain smaller amounts could be used, under Senate File No. 367, for assistance in the payment of pensions, unemployment insurance, health of mothers and children, or related matters, in any county of the state, yet the bulk of the funds was to be used in direct relief and work relief, and in this concurring opinion I will only discuss that phase of the legislation.

It is provided that such relief funds shall be allocated to the county boards of the several counties which cooperate with certain welfare agencies of the state and nation. The funds shall be distributed on the basis of need in such counties when, after reasonable effort, they are unable to furnish necessary and adequate assistance for

dependent persons residing in such counties. The act does not provide for relief to any county unless and until the governing body shall adopt a resolution accepting its provisions. Therefore, the acts are not for the distribution of these funds for relief of needy persons in all the counties of the state uniformly, but are specifically restricted for distribution in those counties which certify to the authorities that they are unable to meet the needs of the relief burden in their counties.

In the briefs before this court, 23 counties appear, joined together as plaintiffs, insisting that these acts are void, and nearly all of their county attorneys were present at the time of the arguments to resist this legislation, for the reason that such counties have so far handled all of the poor relief in each of their counties by their own tax funds, and have not, and insist that they will not, ask the state for any assistance; therefore, they will be excluded from any benefit of this state assistance fund. The counties resisting the enforcement of these laws are Antelope, Arthur, Banner, Butte, Cass, Cuming, Dawson, Grant, Keith, Kimball, Merrick, Nemaha, Saline, Sarpy, Phelps, Seward, Sioux, Hooker, Colfax, Gosper, Saunders, Stanton, and Wayne.

This law clearly authorizes a one-cent tax on gasoline to be collected in each of these 23 counties of our state and expended for relief in the other 70 counties of the state which have already applied to the state for assistance. This legislation taxes, in this way, the people of these 23 counties who are carrying the entire load of supporting their own poor and unfortunate by their own funds, raised by the taxpayers of their county, and expends this one-cent gas tax so raised entirely in other counties who have failed to carry their own relief burden.

It may be argued that money raised by the state for highway purposes, and to erect bridges and build and maintain state highways, might be so disposed of that money raised in one county might be expended for a bridge in another county, although such funds could not be so traced,

but all of such funds can only be spent on a highway which has been designated by the legislature as a state highway which under our law is accepted as a public purpose for the benefit of the entire state.

On the other hand, it is generally held that the relief of the poor is primarily a burden on the county of which such persons are legal residents. The proceeds of this tax, when appropriated to each of the 70 counties sharing therein, will be expended only by the officials of each county, showing it is not for a state-wide public purpose, but for relief in some 70 counties only, and must be expended by such counties according to rules adopted by an outside agency. This taxing of all the people of the entire state, and expending the proceeds for relief only in certain counties, is not considered a public purpose of state-wide extent.

Of the guaranteed rights, that of equality holds high place in the list. "Discrimination of one citizen in favor of another is beyond legislative authority to make, whether legislation expresses it in terms or produces it in result. Classification must be reasonably adapted to secure a legitimate public interest." *Woolf v. Fuller*, 87 N. H. 4.

I cannot agree that the distribution of funds from this one-cent gasoline tax is a general or public purpose when it cannot be used under the very terms of the legislation except in certain counties. Such a law violates the letter and the spirit of our Constitution, which declares that no person shall be deprived of his property without due process of law. Const. art. I, sec. 3.

It is not even sufficient that a tax be levied for a public purpose, but it must be levied for the use of the public of the district taxed. 26 R. C. L. 72, sec. 51.

It is convincing to me that, while a state-wide tax for the benefit of all needy persons throughout the state would be for a public purpose, yet when the benefits of a state-wide tax are limited, and can only be expended in a definite portion of the state, to the exclusion of the balance of the state, it is not a public purpose, and is clearly illegal for that reason.