[No. 31664. *En Banc.* March 5, 1951.]

SENIOR CITIZENS LEAGUE, INC. *et al., Appellants,* v. DEPART-MENT OF SOCIAL SECURITY *et al., Respondents.*[1]

[1]Reported in 228 P. (2d) 478.

*Forrest & Rowles* and *Brown & Millhouse,* for appellants.

*The Attorney General, Jane Dowdle* and *Lyle L. Iversen, Assistants,* for respondents.

HAMLEY, J.—This is a consolidation of two actions which were brought to test the constitutionality of initiative measure No. 178. That initiative, referred to herein as No. 178, was passed by the voters on November 7, 1950, and became effective December 7, 1950. It is a comprehensive act relating to the statewide public assistance program, and amends, in substantial respects, Laws of 1949, chapter 6, p. 24 (Rem. Supp. 1949, §§ 9998-33a *et seq.* [initiative measure No. 172]).

Plaintiffs instituted the two actions on December 18, 1950. In one they asked for a declaratory judgment declaring No. 178 unconstitutional, for injunctions, and for general relief. In the other they asked for injunctions and general relief only. Amended complaints were thereafter filed, the two being identical as to allegations, but with different prayers for relief, as above indicated. Defendants demurred to the amended complaints. At the same time, and for the purpose of expediting the cause, defendants filed an answer to each amended complaint. This was done with the permission of the court and without waiving defendants' demurrers. Plaintiffs then moved for judgment on the pleadings. The two actions were thereafter consolidated. Argument was had at one time on both demurrers and both motions.

The trial court sustained the demurrers, upon the ground that the amended complaints did not state facts sufficient to constitute a cause of action. A decree was accordingly entered, ordering, adjudging, decreeing, and declaring that No. 178 is constitutional, and dismissing the action. Plaintiffs have appealed. When reference is made herein to the department of social security alone, the designation "department" will be used. The term "departments" will be used to designate the department of social security and the department of health.

Respondents present several preliminary questions which must be considered before we reach the issues as to the constitutionality of No. 178. These questions, raised by the demurrers, were not passed upon by the trial court, the demurrers being sustained on other grounds. Although respondents have not cross-appealed, they are entitled to renew these preliminary questions here. This may be done under the rule that, if a decision is based upon an erroneous ground, it will nevertheless be sustained if correct on any ground. *Buchan v. Knight,* 147 Wash. 659, 267 Pac. 43; *In re Rockwood Boulevard,* 170 Wash. 64, 15 P. (2d) 652; *In re Bodvin's Estate,* 37 Wn. (2d) 872, 226 P. (2d) 878.

Respondents first present a jurisdictional question. They contend that this is a suit against the state of Washington;

that suits against the state can be maintained only in the manner in which the legislature has consented that the state shall be sued; and that the legislature has prescribed, as the sole manner in which recipients of public assistance may maintain their rights under the public assistance laws, the fair hearing and court review procedures set out in Laws of 1949, chapter 6, §§ 8 and 9 (Rem. Supp. 1949, §§ 9998-33h, 9998-33i). This procedure was not followed in the instant case. Consequently, respondents argue, the court has no jurisdiction of the subject matter of this action.

■ Respondents are correct in asserting that an action cannot be maintained against the state without its consent. *State ex rel. Pierce County v. Superior Court,* 86 Wash. 685, 151 Pac. 108; *State ex rel. Thielicke v. Superior Court,* 9 Wn. (2d) 309, 114 P. (2d) 1001. Article II, § 26, of the state constitution, provides that the legislature shall direct by law in what manner and in what courts suits may be brought against the state. This has been done, with respect to causes of action in general, by the enactment of Laws of 1895, chapter 95, p. 188, as amended by Laws of 1927, chapter 216 (Rem. Rev. Stat., §§ 886 to 890 [P.P.C. §§ 933-1 to 933-9]).

Respondents make no contention that appellants have failed to follow the provisions of Rem. Rev. Stat., § 886 *et seq.* Hence, with regard to this general statutory procedure, it is not necessary to determine whether this is a suit against the state. Nor is it necessary to decide that question in considering the special statutory and court review procedure provided by chapter 6, Laws of 1949. This is true because that special statutory procedure is exclusive with respect to the kind of grievances therein referred to, whether or not a claim or suit presenting those grievances is considered to be an action against the state.

It only remains to be determined whether the grievances which appellants assert in this case are of the kind referred to in §§ 8 and 9, of chapter 6, Laws of 1949.

This special statutory procedure relates to cases in which an applicant or recipient feels himself aggrieved by the

*decision* of the administrative agency. Appellants, however, do not allege that they are aggrieved by any rule or regulation promulgated by the agency, or by any determination with regard to their individual public assistance grants or eligibility therefor. The gist of their complaint is that No. 178, which purports to amend and modify chapter 6, Laws of 1949, in many respects, is unconstitutional, and that respondents, in proposing to give effect to No. 178, are therefore about to exercise illegal and arbitrary powers to the detriment of appellants.

These allegations may or may not state facts sufficient to constitute a cause of action. They at least disclose that the grievance relied upon is not based upon any decision of the administrative agency. It would accordingly appear that the hearing and court review procedure provided by chapter 6, Laws of 1949, is not here applicable.

Respondents, however, have cited several cases in support of their position that the special statutory procedure governs in this case. One of these, *State ex rel. Breslin v. Todd,* 8 Wn. (2d) 482, 113 P. (2d) 315, involved an application for a writ of mandamus, in which the applicant sought to enforce, as against the commissioners of King county, the public employees' veterans' preference accorded by Rem. Rev. Stat., §§ 10753 and 10754 [P.P.C. §§ 932-47, -49]. The second of these sections provides that a failure by public officials to comply with the veterans' preference requirement shall be a misdemeanor. This court held that mandamus does not lie to enforce the preference, since the legislature intended the criminal penalty as the only remedy. That case was not concerned with administrative or court procedure, but with the ultimate relief available.

Two other cases cited by respondents involved attempts to short-cut the court appeal procedure provided in the workmen's compensation act by filing applications for writs of mandate in the supreme court. These are *State ex rel. Hawksworth v. Clifford,* 130 Wash. 103, 226 Pac. 272; and *State ex rel. Burkhard v. Superior Court,* 11 Wn. (2d) 600, 120 P. (2d) 477. There was no question but that the griev-

ances there presented were of the kind which were governed by the court review procedure provided in the act. We denied the writs on the familiar ground that relief by mandamus will not be permitted where there is a plain, speedy, and adequate remedy by appeal. *State ex rel. LaFollette v. Hinkle,* 131 Wash. 86, 229 Pac. 317, also cited by respondents, likewise involved an application for a writ of mandamus, and no special court procedure statute was involved. We denied the application for the same reason announced in the two preceding cases.

*State ex rel. Kroener v. Department of Social Security,* State Supreme Court No. 31167, also relied upon by respondents, was disposed of by a minute entry denying the application for a writ, no opinion having been issued. Causes disposed of by a simple minute entry are not useful as precedents, since the basis for the court's ruling is not revealed.

Examination of the file in that case indicates, in any event, that the relators claimed to be aggrieved by the act of the department in promulgating certain rules, and in removing one of the relators from the public assistance rolls. The relators had pursued the administrative hearing procedure provided by § 8, chapter 6, Laws of 1949, but desired to short-cut the court review procedure of § 9 by applying to this court for a writ of mandate. Thus no issue was presented as to whether the grievances there asserted were of the kind covered by the special procedure of chapter 6, Laws of 1949.

■ It is our conclusion that, whether or not this is a suit against the state, appellants were not, in view of the nature of the grievances here asserted, required to follow the hearing and court review procedure set out in chapter 6, Laws of 1949. It follows that, with regard to the injunction action, the court had jurisdiction of the subject matter. The declaratory judgment action will be referred to at a later point in this opinion.

Another preliminary question presented by respondents with regard to the injunction proceeding is whether appel-

lants have the legal capacity to sue for an injunction. It is respondents' position that the complaint fails to allege facts showing any actual or threatened deprivation of appellants' private rights.

It is incumbent upon one who seeks relief by temporary or permanent injunction to show (1) a clear legal or equitable right, and (2) a well-grounded fear of immediate invasion of that right. *State ex rel. Hays v. Wilson,* 17 Wn. (2d) 670, 137 P. (2d) 105; *King County v. Port of Seattle,* 37 Wn. (2d) 338, 223 P. (2d) 834.

All of the appellants, except the corporate appellant, were recipients under chapter 6, Laws of 1949, when this action was brought. Recipients or applicants have no inherent or vested right in the public assistance they are receiving or desire to receive. *Adams v. Ernst,* 1 Wn. (2d) 254, 95 P. (2d) 799. The matter of extending, expanding, curtailing, or withdrawing public assistance is one of public policy only. Pension and relief programs not involving contributions to specific funds by actual or prospective beneficiaries provide only a voluntary bounty which may be discontinued at any time. *In re Snyder's Petition,* 93 Wash. 59, 160 Pac. 12.

Appellants do not, however, assert such an inherent or vested right to the benefits they are presently receiving. They do not deny that the state may curtail or discontinue those benefits at any time. It is their position that the state has not done so, since No. 178, purporting to have that effect, is unconstitutional and therefore a nullity. They further contend that chapter 6, Laws of 1949, conferred upon them certain statutory rights to public assistance which they may assert and protect as long as that act is the law.

Respondents do not quarrel with appellants up to this point, and there is little doubt but that chapter 6, Laws of 1949, does confer certain statutory rights which may be enforced as long as that act is in effect. These, in brief, are the rights of persons who meet the eligibility requirements of that act to receive the grants there provided pur-

suant to reasonable and legally authorized rules and regulations fairly administered, and without undue discrimination or preferences. The act itself provides the manner in which those statutory rights may be asserted when invaded by departmental action. (Laws of 1949, chapter 6, §§ 8 and 9.) They are rights which may be enforced in court. See *Conant v. State,* 197 Wash. 21, 84 P. (2d) 378.

But, do appellants have a well-grounded fear of immediate invasion of those statutory rights, assuming, as we must for the purpose of this question, that No. 178 is void and that chapter 6, Laws of 1949, is therefore in full effect? It is on this narrow issue that respondents and appellants part company.

If we should reverse for this reason, having already found that appellants have statutory rights under the 1949 act, which they are entitled to assert, the only result would be a long delay in the ultimate determination of the issues of this case, while appellants wait for specific administrative decisions and then follow the special hearing and court review procedure. Those issues, involving the constitutionality of No. 178, are of paramount public importance. The statute in question involves a basic policy of the state, affects a substantial segment of the population, and must be implemented with very large appropriations. We take cognizance of the fact that the state legislature is now in session, and feel that it will be aided, in its deliberations, by an immediate decision as to the constitutionality of No. 178.

We will accordingly assume, without deciding, that appellants have a well-grounded fear of immediate invasion of their asserted statutory rights under chapter 6, Laws of 1949. There is ample precedent for this course. *Noble v. Dibble,* 119 Wash. 509, 205 Pac. 1049; *Randles v. State Liquor Control Board,* 33 Wn. (2d) 688, 206 P. (2d) 1209. See, also, *Huntworth v. Tanner,* 87 Wash. 670, 152 Pac. 523. We therefore hold that appellants may maintain the action for injunctive relief.

Respondents contend that appellants have no right to bring an action for a declaratory judgment to test the con-

stitutionality of No. 178. This is strenuously argued in the briefs. As before indicated, the allegations of the two complaints, one seeking injunctions and the other seeking a declaratory judgment, are identical. Hence all of the issues which might be considered under the latter complaint are also before us under the injunction complaint. In view of our ultimate disposition of this case, it is therefore unnecessary to decide whether the action for a declaratory judgment is appropriate under the circumstances.

The first constitutional issue presented, and the one principally relied upon by appellants, is whether No. 178 unlawfully delegates legislative authority.

■ The Washington constitution, Art. II, § 1, as amended by the seventh amendment, vests the legislative power in the Senate and House of Representatives, subject to the reserved power of the people to initiate, and to bring about referendums. The legislative power to make purely substantive law cannot be surrendered or delegated to or performed by any other agency. *Uhden, Inc. v. Greenough,* 181 Wash. 412, 43 P. (2d) 983, 98 A. L. R. 1181. This rule is applicable whether the law in question has been enacted by the legislature or by the people through the passage of an initiative measure. *State ex rel. Eckroth v. Borge,* 69 N. D. 1, 283 N. W. 521.

■ The constitutional prohibition against the delegation of legislative power does not preclude the delegation to administrative officers or boards of the power to determine some fact or state of things upon which the application of the law is made to depend, provided the law enunciates a standard by which such officers or boards must be guided. *State ex rel. Chicago, M. & St. P. R. Co. v. Public Service Commission,* 94 Wash. 274, 162 Pac. 523; *State v. Bayles,* 121 Wash. 215, 209 Pac. 20; *Royer v. Public Utility Dist. No. 1,* 186 Wash. 142, 56 P. (2d) 1302; *State ex rel. Washington Toll Bridge Authority v. Yelle,* 195 Wash. 636, 82 P. (2d) 120; *Morgan v. Department of Social Security,* 14 Wn. (2d) 156, 127 P. (2d) 686.

The legislature may also, under proper circumstances, delegate to administrative officers and boards, authority to promulgate rules and regulations to carry out an express legislative purpose, or to effect the operation and enforcement of a law. *Vail v. Seaborg,* 120 Wash 126, 207 Pac. 15; *State v. Nelson,* 146 Wash. 17, 261 Pac. 796; *In re Gifford,* 192 Wash. 562, 74 P. (2d) 475, 114 A. L. R. 348; *Home Owners' Loan Corp. v. Rawson,* 196 Wash. 548, 83 P. (2d) 765; *State v. Miles,* 5 Wn. (2d) 322, 105 P. (2d) 51.

Appellants call attention to twenty-five or thirty separate provisions of No. 178 which, in their opinion, violate this rule against the delegation of legislative powers, as so defined and limited. The majority of these provisions relate to the determination of the amount of assistance to which individual recipients may be entitled. Some of the provisions, however, pertain to the determination of eligibility for any assistance, while others pertain to both of these factors. Appellants contend, as to each of these provisions, (1) that there is a delegation of power without any attempt to prescribe legislative standards, or (2) that the purported standards are phrased in words of such vague and doubtful meaning or so patently permit the exercise of almost unlimited discretion that they constitute, in effect, no standards.

We have given careful consideration to all of the criticized statutory provisions, and have selected representative examples for discussion in this opinion. Most of the provisions of No. 178 amend various sections of chapter 6, Laws of 1949, or add new sections to that chapter. As a matter of convenience, we will, unless otherwise indicated, refer to the sections of chapter 6 as so amended or added, and not to the section of No. 178 which accomplishes such change. In all cases, the italics have been supplied.

Appellants contend that § 3 (e), defining the term "need" constitutes a delegation of power without any attempt to prescribe legislative standards. This provision reads as follows:

" 'Need'—The amount by which the requirements of an individual for himself and the dependent members of his family, *as measured by the standards of the department*, exceed all income and resources available to such individual in meeting such requirements."

Specifically, appellants assert that this provision gives the department unlimited power to set its own "standards." They argue that the directions relative to the setting of standards contained in § 5, are not applicable, because those directions pertain to "standards of assistance" and not to standards for measuring "requirements," dealt with in § 3 (e).

We cannot agree with appellants' interpretation of § 5. The first paragraph of that section specifically provides that the "standards of assistance" there referred to shall be used to determine "an applicant's or recipient's *living requirements* . . . ." These are plainly the same standards referred to in § 3 (e).

Section 5 contains detailed directions for the guidance of the department in developing these standards for all categories of applicants and recipients. Among other things, it is provided, in the first paragraph of § 5, that such standards shall include reasonable allowances for shelter, fuel, food, clothing, household maintenance and operation, personal maintenance and necessary incidentals. The department is directed, in the second paragraph, to establish objective budgetary guides based upon actual living cost studies of the items of the budget. These budgets are to be renewed or revised at least semiannually. The department is directed, in the fourth paragraph, to take into account the economy of family living arrangements in developing such standards. This paragraph of § 5 further provides that the department may, by rule and regulation, prescribe maximums for grants on the basis of the size and type of the household unit, which maximums shall be "related to average family income in this state."

The fifth paragraph, which pertains specifically to general assistance for unemployed employable persons, provides that the standards of assistance shall be based upon

annual living cost studies; shall be compatible with a minimum necessary for decent and healthful subsistence; and shall permit the meeting of "actual and emergent" needs on an individual basis. The first paragraph of § 5 also makes reference to the so-called sixty-dollar minimum monthly grants, and provides that such minimum is to apply only to an individual living alone under "average conditions," providing the individual's "actual requirements" amount to sixty dollars. Under the third paragraph of § 5, this minimum is subject to revision according to a stated formula based upon monthly changes in the consumers' price index for moderate income families in the city of Seattle, Washington, issued by the bureau of labor statistics of the United States department of labor.

Appellants argue that most of the provisions of § 5 referred to above are useless as standards, because they employ words and terms of doubtful and uncertain meaning, or because they contain words and terms which leave the door open for the exercise of almost unlimited discretion. Appellants ask: What is an "objective budgetary guide"; a "family"; an "average family"; a "household unit"; "actual and emergent need"; "average conditions"? They inquire as to the meaning of "related to"; "type"; and "compatible with." They want to know if "based upon" is the same as "equal to." They query: The "actual living cost studies" of whom? The "annual living cost" of whom? Appellants examine the provision relative to the so-called sixty-dollar minimum, and conclude that it is completely illusory.

It is beyond the scope of this case for us to enter into an analysis of each such term and phrase in an effort to arrive at precise definitions to be stated in this opinion. While appellants suggest difficulties which may be encountered, we cannot anticipate which of these words and terms may, in practice, prove controversial. Nor can we, as a practical matter, make such determinations in a vacuum, so to speak, that is, without having before us an actual or proposed

application of the questioned word or term in a specific, case.

It is enough to say, for present purposes, that, in our opinion, the words and terms referred to are not of doubtful and uncertain meaning, in the sense that such meaning may not be definitely and readily ascertained. Most of them, in fact, are common words and terms having a generally accepted meaning. Where this is not the case, the meaning may be ascertained by considering the context; having recourse to standard reference works; giving effect to established administrative interpretations; applying judicial precedents; and making use of other legally permissible intrinsic and extrinsic aids to statutory construction.

There is no doubt that many of these words and terms are of a kind which permits or compels the exercise of administrative discretion in varying degrees. Such discretion, however, must be exercised within the framework of the entire act. It must be consonant with the declarations of legislative policy which precede the substantive provisions of the act (to be discussed below); it must be directed toward the attainment of the specific policy provisions which are set forth in the body of the act; it must be applied uniformly throughout the state (as required by § 10 of chapter 6, Laws of 1949, which has not been repealed by No. 178, with certain possible exceptions which need not now be considered); and it must be limited to the fields which remain after making conscientious use of the methods and techniques specified in § 5 and elsewhere in the act.

One of the principal devices which § 5 empowers the department to employ in developing its standards of living requirements (objective budgetary guides) is an administrative method in general use by similar state agencies throughout the nation. In this state it finds its genesis in Laws of 1939, chapter 216, § 17, p. 874. Initiative measure No. 141, adopted in 1940 (chapter 1, Laws of 1941), contains no similar provision, but the department, exercising its general rule-making power under that act, did set up a budgetary system as an aid in fixing the amount of grants.

Section 5 (a) (1) of chapter 6, Laws of 1949, expressly requires the department to establish "objective budgetary guides." Commenting on this particular administrative technique, as employed by the department pursuant to its rule-making power under chapter 1, Laws of 1941, this court said, in *Morgan v. Department of Social Security*, 14 Wn. (2d) 156, 185, 127 P. (2d) 686:

"We find nothing contrary to the law in the establishment of such a yardstick as the department has set up, referred to herein as its budgetary system, and, indeed, it would seem that some such framework is required in order to establish a necessary equality in the fixing of the grants."

We do not undertake to say that each and every purported standard and administrative technique provided in § 5 is free from ambiguity and is practicable of application. It may be, for example, that the provision of § 5 relating to a sixty-dollar minimum grant is illusory, as appellants contend. We are of the view, however, that taking § 5 as a whole, and in consideration of all provisions therein contained, sufficient legislative standards are supplied to meet the constitutional requirement. In view of the application of those standards to § 3 (e), we are of the opinion that the latter section does not unlawfully delegate legislative authority to the department.

Appellants contend that several provisions of the act unlawfully delegate legislative power because they authorize the department to fix "maximum" values and units, and "ceiling" values, without prescribing necessary legislative standards.

Section 3 (f) (4), relative to the exemption of an automobile or other form of conveyance from classification as a "resource," gives the department the right, by rule and regulation, to fix a "maximum" value on such conveyance. The second paragraph of § 3-a (b), relative to the exemption of a home and of personal property and belongings from classification as a "resource," gives the department the right, by rule and regulation, to fix "maximum" values, and "maximum" units of personal property, regardless of

value. The third paragraph of § 3-a (b), relative to the consideration of the value of home property and personal property and belongings in determining eligibility, gives the department the right, by rule and regulation, to fix "ceiling" values.

Appellants, after pointing out the important bearing which these provisions have upon the determination of eligibility and the amount of individual grants, argue that there is no standard whatsoever by which the department may be guided in its determination of any of these "maximums" or "ceilings." It is contended that the department has complete and unfettered discretion, "by juggling these maximums," to determine who shall receive money from the public treasury, and how much they shall receive. They ask: Who can possibly say as a matter of law what is or is not a reasonable "maximum" for a home, a car, or personal property, even assuming that the word "reasonable" is read into the act?

It is to be noted that these "maximum" values or units, and "ceiling" values, are to be fixed by rule and regulation. Thus it is clear at the outset that the department is not at liberty, by "juggling" the maximums, to carry out a preconceived purpose to discriminate against or give preference to particular applicants or recipients. Such rules and regulations must be reasonable. This means that they must be based upon reasonable grounds, having in view the stated objectives of the legislation, and must affect alike all persons or things within the same class.

The objectives of the legislation are rather clearly revealed when the entire act is read and considered together. Those objectives are also expressly stated, in summary form, in the declaration of legislative policy which is set forth in § 2 of No. 178. That declaration reads as follows:

"It is the purpose and intent of this act to provide for the public welfare by making available, in conjunction with federal matching funds, such public assistance as is necessary to insure the recipients thereof a reasonable subsistence compatible with decency and health. This act recognizes that there are possibilities of serious abuses of

such a program whereby those least deserving of public aid will benefit at the expense of the deserving, and of the state and its political subdivisions, and it is intended hereby to make possible sufficient administrative control of the program of assistance to curb or at least minimize such abuses without at the same time depriving qualified applicants and recipients of the assistance to which they are rightfully entitled."

It will be observed that the quoted declaration of policy lays down the following standards or guides:

(1) The purpose is to provide for the public welfare.

(2) Public assistance is to be made available in conjunction with Federal matching funds.

(3) Such public assistance is to be provided as is necessary to insure a reasonable subsistence compatible with decency and health.

(4) The act is to be administered in such way as to avoid abuses whereby those least deserving of public aid will benefit at the expense of the deserving, and of the state and its political subdivisions.

(5) Such abuses are to be curbed without depriving qualified applicants and recipients of the assistance to which they are rightfully entitled.

One of the most important of these guides or standards is (2), which provides that the public assistance be made available "in conjunction with" Federal matching funds. This direction is not as broad as that contained in § 2 of chapter 6, Laws of 1949, where the intention was expressed to take "the fullest possible advantage" of the provisions of the Federal social security act. To the extent that the two are in conflict, the provision in No. 178 governs, under the theory of implied repeal. At the very least, however, the declaration in No. 178 requires that the state public assistance program be so administered as to qualify the state to receive, in so far as the state's contribution permits, the fullest available measure of Federal matching funds. This intent is further borne out by the provision of § 17, chapter 6, Laws of 1949 (not repealed by No. 178) declaring

chapter 6 inoperative to the extent that it fails to conform to the Federal social security act.

The significance of this declaration of § 2 of No. 178 as a legislative guide or standard is apparent, in view of the well-known fact that Federal matching funds are made available to the states only where there is adherence to general principles and standards formulated at the Federal level. The result is that there must be read into No. 178, as additional legislative standards, such of these Federal principles and standards which must be complied with in order to obtain Federal matching funds. See *Morgan v. Department of Social Security, supra,* which dealt with this problem at length.

Perhaps the most important of the guides or standards set out in § 2 of No. 178 is (3), which sets as the legislative goal a reasonable subsistence "compatible with decency and health." Appellants assert that this standard is not applicable in considering the department's power to determine eligibility, since the term "recipients" is used, and "applicants" are not there referred to. A "recipient" is defined (§ 3 (c)) as any person receiving assistance or currently approved to receive assistance at any future date.

In our opinion, this particular standard, although using the word "recipients" is not to be limited in the manner suggested by appellants. Section 3, defining terms, begins with the provision that the definitions shall apply "unless the context indicates otherwise." We think the context of § 2 of No. 178, being an over-all declaration of policy applicable to the entire act, adequately indicates that the term "recipients" as there used is to be given a broader application than called for by the definition in § 3 (c). It seems to us that the standard in question supplies a guide not only for determining the amount of assistance to be provided to those found eligible, but lays down the legislative policy that persons who are in need of assistance in order to live in decency and health shall, where they meet the express tests of eligibility provided in the act, be considered recipients under the act.

Giving effect to these declarations of policy, we are of the opinion that the power conferred upon the department to fix "maximums" and "ceilings" is subject to sufficiently definite legislative standards to guide the department and to permit of judicial review of individual determinations. To be specific, the pertinent legislative standards assure, among other things, that the "maximums" and "ceilings" (1) shall not be so high or so low as to result in withdrawal of Federal matching funds; (2) shall not be so low that the resulting hardships and burdens in effect compel applicants and recipients to forego the public assistance they should have to provide a reasonable subsistence compatible with decency and health; and (3) shall not be so high as to benefit those least deserving of public aid at the expense of those most deserving.

We accordingly hold that the provisions in question do not unlawfully delegate legislative authority to the department.

In reaching this conclusion, application has been given to the rule that the complexity of the subject matter of legislation, and its character as an exercise of police power or otherwise, are to be taken into consideration in determining whether there has been an unlawful delegation of legislative power. As this court said, in *Kelleher v. Minshull,* 11 Wn. (2d) 380, 397, 119 P. (2d) 302, in sustaining the constitutionality of the small loan act:

"It is not always necessary that statutes and ordinances prescribe a specific rule of action. This is particularly true in those situations where it is difficult or impracticable to declare a definite, comprehensive rule, or where the discretion to be exercised by an administrative officer relates to a regulation imposed for the protection of public morals, health, safety, and general welfare. 11 Am. Jur. 948, Constitutional Law, § 234."

A similar view was expressed in *State ex rel. McBride v. Superior Court,* 103 Wash. 409, 174 Pac. 973, where, in upholding health ordinances relating to quarantine which

left to health boards the definitions and classifications of diseases, the court said:

"The legislation is that of the legislative body, but it is not always practical to meet every phase of the necessity that has called for the law by the enactment of a general statute." (p. 425.)

The problem with which No. 178 deals is extremely complex. In essence it is the problem of meeting, within the limits of a fixed fund established by biennial appropriations, the varying public assistance needs of an unpredictable number of recipients. The fund is static, but the number of recipients and the needs of each vary as they are affected by the impact of constantly changing economic and social factors. Not only must the administrative system established by the legislation cope with this problem, but it must do so in such manner that public assistance will be rendered on a fair and uniform basis, without undue delays, and within reasonable limits as to administrative expense.

It is very evident that the desired results could be achieved only by conferring upon the administrative agency a large measure of power to find facts, establish standards, and exercise discretion, controlled only by very general statements of legislative policy. This allows for the ascertaining and utilization of information which could not possibly be available to the legislature or people generally. It also makes possible the adjustment, from time to time, of the over-all program and its application to certain categories and situations, to take into account changing case loads, variations in average income and living requirements as affected by time, geographical location and other factors, and current prospects as to the sufficiency of funds. Any attempt to set forth in the act, in precise and unvarying form, the detailed standards which must be followed would, in view of these considerations, be wholly unrealistic.

The history of legislation in this state relating to the care of the poor, as in most of the other states in the country, shows very clearly that the courts have never been concerned with the need of such a statute to contain specific and definitive standards. The first poor laws of this state,

which were enacted in 1854 (Rem. Rev. Stat., §§ 9981-9992), and which were finally repealed by chapter 180, Laws of 1937, prescribed no standard of measurement of need or resources of any kind to aid the county commissioners in determining how much assistance should be given to the poor in each county. The 1937 act gave the department far more discretion than is conferred upon it by No. 178. Section 6 of that act simply empowers the department to fix "statewide uniform standards" for all public assistance, and to effect uniform observance of these standards throughout the state, provided that such standards be in conformity with the Federal social security and other acts and the laws of this state pertaining to public assistance. See *State ex rel. Boyle v. Ernst,* 195 Wash. 214, 78 P. (2d) 526.

The growth of the present social security laws of this state, with their definitions of need, resources, eligibility, and other terms, is traceable not to any constitutional sanction, but largely to the requirements of the Federal security agency.

Typical of the more general public assistance statutes which were in effect generally prior to the changes made necessary by the Federal act, is the Illinois statute, enacted in 1932 (Smith-Hurd Illinois Annotated Statutes (Perm. ed.), chapter 23, § 394). This two-paragraph act provided that the Illinois emergency relief commission shall provide relief to residents of Illinois who, by reason of unemployment or otherwise, "are destitute and in necessitous circumstances." It was further provided that such relief shall be provided by distributing funds or supplies "and by any other means desirable by the commission." Thus there was left entirely to the commission the fixing of standards for the determination of both eligibility and amount of assistance to be provided, the only legislative guide being that the recipients be "destitute and in necessitous circumstances."

Holding that this statute did not unlawfully delegate legislative power, the supreme court of Illinois, in *Reif v. Barrett,* 355 Ill. 104, 132, 188 N. E. 889, said:

"Legislative power is authority to pass rules of law for the government and regulation of people or property. Where the legislative body has the power to enact a law as a necessary adjunct to such power it has the legal right to adopt a procedure for the administration of such law. It may do this through commissions, or through boards, and it may grant to such administrative bodies certain authority and certain powers in keeping with the spirit of the act for the practical application and operation of the law. It may even invest them with certain discretion to be exercised by them in the discharge of their functions as ministerial or administrative agencies. Such exercise of discretion may be found in laws governing the assessment of taxes, the Industrial Commission,. and different examining boards passing upon applications of those desiring to practice professions. It is impractical for legislative acts providing for the health, welfare, protection and necessities of the people through boards or commissions, to prescribe every detail of the duties to be. performed by such boards or commissions. Such powers, when granted, are neither judicial nor legislative. . . . The discretion granted is not a judicial or legislative discretion but a ministerial discretion falling within the doctrine of *ejusdem generis* as to powers conferred by the act."

A Nebraska act which, it seems to us, is more general than the Illinois statute upheld in *Reif v. Barrett,* was declared unconstitutional, as a delegation of legislative power, in *Smithberger v. Banning,* 129 Neb. 651, 262 N. W. 492, 100 A. L. R. 686.

To the same effect as the *Reif* case, see *Schneberger v. State Board of Social Welfare,* 228 Iowa 399, 291 N. W. 859. See, also, 92 A. L. R. 400, 410; 11 Am. Jur. 949, Constitutional Law, § 234. As pointed out by this last-cited authority:

"The modern tendency is to be more liberal in permitting grants of discretion to administrative bodies or officers in order to facilitate the administration of laws as the complexity of economic and governmental conditions increases."

It is mainly these considerations which distinguish the instant case from *State v. Gilroy,* 37 Wn. (2d) 41, 221 P. (2d) 549, upon which appellants rely. The statute which was there held invalid as an unlawful delegation of legislative power, dealt with the one relatively simple and

static problem of approving and supervising child-care homes. There was no good reason why the legislature should not have provided comparatively definite standards. The act specified some standards, but contained other provisions conferring almost *carte blanche* authority upon the agency to devise its own standards, along suggested lines, to be applied in granting or withholding approval. One of these provisions, for example, authorized the agency to withhold approval if it should fail to obtain satisfactory assurance that the home "is necessary and desirable for the public welfare." The act contained no declaration of policy, and nowhere else in the statute did the legislature indicate what was to be taken into consideration in determining what is "necessary and desirable" for the public welfare.

Another distinguishing feature between the *Gilroy* case and the one before us is that in the former the statute provided for the regulation of private property or business, whereas public assistance laws confer merely a statutory privilege.

Where the statute deals only with a privilege which the state is free to withdraw completely at any time, the courts are less strict in the application of the delegation principle than where the statute affects an established personal or property right. See the annotations in 12 A. L. R. 1435; 54 A. L. R. 1104; and 92 A. L. R. 400.

Appellants contend that § 16 (e) constitutes an unlawful delegation of legislative power. This section reads as follows:

"(e) The provisions of Sections 3 (a), (b), (c), (d), and (e) shall apply in determining elegibility for General Assistance to unemployed employable persons and emergency General Assistance. In the determination of need of applicants for General Assistance to unemployed employable persons and emergency General Asistance, no resources shall be considered as exempt per se; but the department may, by rule and regulation, adopt standards which will permit the exemption of residential property and personal property and belongings from consideration as an available resource when such resources are determined to be *essen-*

*tial to the applicant or recipient's restoration to inde-
pendence."*

It is seen that, under this provision, the exemption of
any such property from classificatiton as a "resource," and
the extent of such exemption, if any, is made to rest upon
whether such resources are determined to be "essential to
the applicant or recipient's restoration to independence."
Appellants contend that this confers upon the department
unlimited discretion as to who shall receive such assistance,
and how much, and is particularly objectionable because it
seems to direct that individual circumstances be taken into
consideration.

We do not believe that this provision violates the prohi-
bition against delegation of legislative power. The problem
which is there dealt with is especially complex. It was the
evident purpose to extend, where necessary, general assis-
tance to unemployed employable persons, and emergency
general assistance. The first sentence of the quoted section
makes applicable the first five definitions set forth in § 3.
The fifth of these, (e), defines "need," and, as we have seen,
gives application to the standards developed by the depart-
ment pursuant to § 5 of the act.

The classes of recipients dealt with in § 16 (e), that is,
unemployed employable persons and those entitled to emer-
gency general assistance, are in the position of transients,
in so far as the public assistance rolls are concerned, as
compared to the other categories—recipients of old age
assistance, aid to dependent children, and aid to the blind.
It is therefore natural that the legislation, in recognition of
the more temporary character of public assistance available
under § 16 (e), provides that the exemption of property
from classification as resources should be referenced to the
recipient or applicant's restoration to independence.

This is a logical and reasonable purpose. It should not be
considered beyond the power of the legislature or people to
effectuate such a purpose simply because it is not practi-
cable to refine the standard any further. The department is
not empowered to make these determinations on an en-

tirely individual basis, since the section provides that such exemptions can be made only in accordance with standards adopted by rule and regulation. Those standards, in turn, must be in harmony with the legislative declarations of policy set out in § 2 of No. 178.

We are of the opinion that § 16 (e) does not unlawfully delegate legislative authority to the department.

We have, up to this point, discussed and held to be valid, in so far as delegation of legislative power is concerned, the following provisions of chapter 6, Laws of 1949, as amended by No. 178: Sections 3 (e) and (f) (4); 3-a (b), paragraphs 2 and 3; 5; and 16 (e).

All of the other provisions challenged by appellants have been studied, and we likewise find them inoffensive when tested by the constitutional prohibition against the delegation of legislative powers. Our reasoning in reaching this conclusion as to each such provision has been similar or analogous to that which has been set out above. It is our conclusion that No. 178 is not unconstitutional because of any supposed unlawful delegation of legislative powers.

Appellants next contend that the failure of No. 178 to provide for notice and an opportunity to be heard prior to the promulgation of agency rules and regulations deprives them of their property without due process of law, contrary to the provisions of Art. I, § 3, of the Washington state constitution and the fourteenth amendment of the Federal constitution.

The act empowers the department or departments to promulgate rules and regulations fixing maximums and minimums, establishing standards to be used in determining eligibility and the amount of individual grants, and setting up other guides and criteria to be followed in administering the act. There is no provision in the act for notice and hearing prior to the promulgation of such rules and regulations. There are several provisions requiring the department to adopt fact-finding procedures in formulating

such rules, but these procedures do not contemplate notice to the public or hearings as a matter of right.

■ The essential elements of the constitutional guarantee of due process, in its procedural aspect, are notice and an opportunity to be heard or defend before a competent tribunal in an orderly proceeding adapted to the nature of the case. *In re Hendrickson,* 12 Wn. (2d) 600, 123 P. (2d) 322; 12 Am. Jur. 267, Constitutional Law, § 573.

Procedural due process is not required, however, in the formulation and issuance of general rules and regulations, as distinguished from the rendering of determinations and decisions in adjudicatory proceedings. Nor is procedural due process required where there is no interference with life, liberty, or a vested property right. Measured by either of these tests, it is clear that the sanctions of the due process clauses are not here applicable.

"Rule-making" is legislation on the administrative level, i.e., legislation within the confines of the granting statute, as required by the constitution and its doctrine of nondelegability and separability of powers. *Willapoint Oysters, Inc. v. Ewing,* 174 F. (2d) 676, certiorari denied, 338 U. S. 860. It is the function of laying down general regulations as distinguished from orders that apply to named persons or to specific situations, the latter being adjudicatory in nature. Administrative Rule-Making, Fuchs, 52 Harv. L. Rev. 263.

Admitting that problems are encountered in classifying some kinds of procedures as rule-making on the one hand, or judicial or quasi-judicial on the other, no such difficulty is presented in this case. The rules and regulations which may be prescribed under No. 178 are those which relate to classes of persons and situations, as distinguished from specific persons and situations. They are, to use the language of the administrative procedure act, 60 Stat. 237, § 2 (c), 5 U.S.C.A., § 1001 (c), agency statements of "general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . ."

The due process provisions do not require that there be notice and hearing before the promulgation of such rules and regulations. *Spokane Hotel Co. v. Younger,* 113 Wash. 359, 194 Pac. 595; *Bi-Metallic Inv. Co. v. State Board of Equalization,* 239 U. S. 441, 60 L. Ed. 372, 36 S. Ct. 141; *Willapoint Oysters, Inc. v. Ewing, supra; Guiseppi v. Walling,* 144 F. (2d) 608, 155 A.L.R. 761; *H. F. Wilcox Oil & Gas Co. v. State,* 162 Okla. 89, 19 P. (2d) 347, 86 A.L.R. 421.

Whether due process requires that such rules and regulations be thereafter publicized is not here in issue. In any event, § 10, chapter 6, Laws of 1949, requires that departmental rules and regulations be publicized by filing the same with the secretary of state.

In the *Spokane Hotel Co.* case, this court held that a statute authorizing the industrial welfare commission to fix the minimum wages for women, without giving notice to employers with opportunity to be heard, is not unconstitutional as depriving a person of life, liberty or property without due process of law. The supreme court of the United States, in the *Bi-Metallic Co.* case, upheld an order of the Colorado state board of equalization, issued without prior hearing, increasing the valuation of all taxable property in the city of Denver forty per cent. The decision in the *Willapoint Oysters, Inc.,* case sustained the validity of a regulation, promulgated without prior hearings by the Federal security agency administrator, establishing standards of identity and fill of containers of all canned oysters. In the *Wilcox Oil & Gas Co.* case, rules and regulations of the Oklahoma corporation commission, designed for general application to prevent waste in the oil production industry, and issued without notice or hearing, were held not to contravene the due process requirement. The reasoning of all of these cases is epitomized in this observation by Justice Holmes in the *Bi-Metallic Co.* case:

"Where a rule of conduct applies to more than a few people it is impracticable that every one should have a direct voice in its adoption. The Constitution does not

require all public acts to be done in town meeting or an assembly of the whole." (p. 445.)

Three decisions cited by appellants on this branch of the case are readily distinguishable, because they dealt with quasi-judicial proceedings involving the property rights of specific individuals. *Morgan v. United States,* 304 U. S. 1, 82 L. Ed. 1129, 58 S. Ct. 773, 999, was concerned with the validity of an order of the secretary of agriculture fixing maximum rates to be charged by market agencies at the Kansas City stock yards. *Southern R. Co. v. Virginia,* 290 U. S. 190, 78 L. Ed. 260, 54 S. Ct. 148, had to do with a statute which empowered a state officer to require individual railroads to eliminate grade crossings at their own expense. *Wichita R. & Light Co. v. Public Utilities Commission,* 260 U. S. 48, 67 L. Ed. 124, 43 S. Ct. 51, dealt with an order denying a gas rate increase to a particular utility company.

*Western Union Telegraph Co. v. Industrial Commission,* 24 F. Supp. 370, also cited by appellants, held that the Minnesota industrial commission could not fix a minimum living wage for women and minors without first according a full hearing. The only authority cited in support of this ruling was *Morgan v. United States,* 298 U. S. 468, 80 L. Ed. 1288, 56 S. Ct. 906, which is a prior appeal in the same *Morgan* case referred to above. As we have seen, the *Morgan* case did not involve administrative rule-making. In any event, the *Western Union Co.* decision is contrary to our own decision in *Spokane Hotel Co. v. Younger, supra,* and hence is not an acceptable precedent on the issue before us.

█ We are of the view that the authority conferred upon the departments by No. 178, to make rules and regulations, adopt standards, and fix maximums and minimums, pertains to legislative rule-making, and is not, in so far as the requirements for notice and hearing are concerned, governed by the due process provisions of the state and Federal constitutions.

 In addition to the foregoing reasons, the due process requirement must be held to be inapplicable here because appellants are not asserting the kind of a right with which the due process provisions are concerned.

The term "property," as used in the due process clause, refers to vested rights. It has no reference to mere concessions or privileges which a state or municipality may control, and bestow or withhold at will. 16 C.J.S. 1195; 1198, Constitutional Law, § 599; 4 Selected Essays on Constitutional Law (Foundation Press-1938) 568. Appellants, as we have already seen, have no vested rights to public assistance, whether provided by chapter 6, Laws of 1949, or otherwise. Therefore, the rules and regulations which may be promulgated under No. 178 cannot deprive appellants of property subject to protection under the due process requirement.

We conclude that No. 178 does not contravene the due process provisions of the state and Federal constitutions.

Appellants next assert that No. 178 denies equal protection of the laws, in violation of the fourteenth amendment to the Federal constitution.

In support of this argument, appellants suggest a number of ways in which the act may be administered so as to unduly favor one individual or class of individuals over another in the matter of eligibility or amount of grant. It is also asserted that § 15 (f), in providing for the delegation of the administration of local health programs to local or county departments, and § 15 (e), in authorizing the department of health to provide medical services on any one of three bases (contract, state professional staff, or direct payment of fees), also contravene this constitutional safeguard.

 Where individuals or classes of individuals are treated differently on the basis of classifications established by statute or administrative rule, the equal protection clause requires that such classifications be reasonable and based upon some principle of public policy, and that they be not arbitrary or capricious. *Spokane & Eastern Trust*

*Co. v. Hart,* 127 Wash. 541, 221 Pac. 615; 12 Am. Jur. 147, Constitutional Law, § 480.

We find no provision of No. 178 which establishes a mandatory statutory classification that is arbitrary or capricious, or which compels the departments to establish arbitrary or capricious classifications. The act is not, for the most part, self-executing. Whether it will actually be administered in an arbitrary or capricious manner, can not now be foretold. Any attempt to deal with this question now is therefore wholly premature, and must await the incidents of actual administration.

■■■ What has just been said with respect to the equal protection clause applies, with equal force, to appellants' contention that No. 178 violates Art. I, § 12, of the Washington state constitution, prohibiting special privileges and immunities. The act does not compel a violation of these constitutional guarantees, and hence is not *per se* unconstitutional on these grounds. Whether it will be administered in such manner as to violate those provisions, remains to be seen.

Finally, appellants challenge the sufficiency of the ballot and legislative titles. The constitutional provision thus invoked is Art. II, § 19, of the Washington state constitution, reading as follows:

"No bill shall embrace more than one subject, and that shall be expressed in the title."

■■■ This constitutional provision applies only to legislative titles. Ballot titles are governed by Rem. Rev. Stat., § 5398 [P.P.C. § 639-3]. This statute provides, in effect, that ballot titles shall express and give a true and impartial statement of the purpose of such measure, and shall not be intentionally an argument, or likely to create prejudice, either for or against the measure.

The ballot title reads:

"An Act modifying the Citizens Security Act of 1948 (Initiative Measure No. 172) and transferring the public assistance medical program to the Department of Health."

Appellants concede that this title definitely and fairly states the purpose of the medical section as transferring the program from the department of social security to the department of health, and properly states that initiative No. 172 (chapter 6, Laws of 1949) is modified. But they assert that there is nothing in the title to indicate that "the standards have been removed" and that both the eligibility for relief and the amount and method of medical treatment "have been turned over to the arbitrary and unlimited" discretion of the directors of the two departments.

In our view, No. 178 does not turn over the determination of eligibility and the amount of medical treatment to the "arbitrary and unlimited" discretion of the directors. The inclusion of such a statement would, for that reason, be improper. It would also run counter to the statutory prohibition against including argumentative material designed to create prejudice. We are of the opinion that the ballot title meets the statutory requirements.

The legislative title is mere surplusage, since the constitutional provision quoted above applies only to "bills." A bill is a "form or draft of a law presented to the legislature for enactment." Webster's New International Dictionary. The term refers to proposed laws pending in the legislature. *In re Hulet,* 159 Wash. 98, 292 Pac. 430; *Hubbard v. Lowe,* 226 Fed. 135; *May v. Rice,* 91 Ind. 546; *State v. Hegeman,* 2 Pennewill (Del.) 147, 44 Atl. 621. Many initiatives which have been passed by the people of this state have had no legislative title. For example, two preceding initiatives having to do with public assistance (initiative measure No. 172 [chapter 6, Laws of 1949] and initiative measure No. 141 [chapter 1, Laws of 1941]) had ballot titles but no legislative titles. No act passed by the people of this state has ever been declared unconstitutional because of a defective legislative title.

However, if it is assumed that a legislative title is required by law, we are of the view that the legislative title here used adequately meets the constitutional re-

quirements, as recently enunciated in *Gruen v. State Tax Commission,* 35 Wn. (2d) 1, 211 P. (2d) 651.

No. 178 is not unconstitutional, and the trial court properly dismissed the complaints.

The judgment is affirmed.

BEALS, ROBINSON, MALLERY, and GRADY, JJ., concur.

DONWORTH, J. (concurring in the result)—Ten individual appellants have been recipients of various types of public assistance under the provisions of initiative 172 (chapter 6, Laws of 1949).

The people of this state, acting in their legislative capacity, enacted initiative 178, which amended initiative 172 in the particulars described in the majority opinion. These appellants assert that these amendments are unconstitutional on three grounds:

(1) They constitute a delegation of legislative power without prescribing standards.

(2) They violate the due process and equal protection clauses of our state and Federal constitutions, and

(3) The title of the amendatory act and the ballot title are insufficient under Art. II, § 19, of the state constitution.

In my opinion, the ten individual appellants have no standing to raise the first two questions above stated. Obviously, appellant Senior Citizens League, Inc., cannot question the constitutional validity of these amendments on any ground.

With respect to the first claim of unconstitutionality, these recipients accepted assistance under initiative 172, which appears to me to contain a delegation of legislative power comparable, though stated somewhat differently, with the provisions of initiative 178. The former act may be as vulnerable to attack in this respect as initiative 178. If their position be well taken, any rule which would render 178 unconstitutional on this ground, might also be applicable to 172. The majority opinion indicates that earlier relief acts gave far more discretion to the officers charged with their enforcement than is conferred by 178.

Thus, these appellants, if their argument be followed to its logical conclusion, might be left without any public assistance. In any event, I do not think that they should be permitted to enjoin the operation of an amendatory act and to assume the validity of a basic act which has sufficiently similar delegations of legislative power to warrant testing its validity.

In passing on the constitutionality of a legislative act, this court cannot hold it to be unconstitutional unless it appears to be invalid on the face of the act itself or from facts of which the court may take judicial notice. *Ajax v. Gregory*, 177 Wash. 465, 32 P. (2d) 560.

If this question of improper delegation of legislative power is properly before us, I cannot find from initiative 178, or from anything of which the court can take judicial notice, that the problem confronting the people when they enacted it could have been dealt with as a practical matter without conferring upon the administrative agency the powers which are conferred upon it therein. For the reasons stated in the majority opinion, I concur in holding that there was no unconstitutional delegation of legislative power.

The second ground, assuming these ten appellants are in a position to raise the question, is clearly without merit. The legislature, or the people acting by initiative measure, may grant or withhold the privilege of receiving public assistance as they see fit. There is no vested right of any individual to be cared for in any particular manner.

As this court said in *In re Snyder's Petition*, 93 Wash. 59, 160 Pac. 12, 3 A. L. R. 1230:

"No individual or class of individuals can acquire a vested right to be cared for in any particular manner. Indeed, the state is under no legal obligation to care for its poor at all. While it undoubtedly has a moral obligation to do so, there is no such obligation as can be enforced in law. Such relief as it does provide is legally in the nature of a largess or bounty, which may be discontinued at the legislative will."

A more recent decision on this subject is *Adams v. Ernst*, 1 Wn. (2d) 254, 95 P. (2d) 799, where the 1935 act relating to old age assistance was amended by a later act in 1939 to the disadvantage of the recipient involved in that case. In upholding the power of the legislature to so amend the prior act, we said:

"The term 'vested right' is not easily defined and has been used by the courts to express various shades of meaning. However, the term has been commonly held to connote 'an immediate fixed right of present or future enjoyment' and 'an immediate right of present enjoyment, or a present fixed right of future enjoyment.'

"We think that the 1935 act did nothing more than to confer upon a certain class of persons a statutory privilege entitling them to receive assistance from the state under the provisions of that act. However, if that privilege is to be dignified by calling it a right, it is one which, by the very act which created it, is expressly subject to amendment or repeal. It is not a vested right in the sense that it is property or that it has become fixed and of which the beneficiary cannot be deprived without his consent; rather is it a qualified right, contingent upon the continued existence of the law which gave it original substance.

"Since, as we now hold, the right or privilege conferred by the 1935 act was not, in a legal sense, a vested right, but was, by § 21 of that act, expressly made subject to the provisions of any amending or repealing act, and since the state has exercised the prerogative reserved to it in § 21 and has, by the act of 1939, disclaimed liability for any and all claims of right based on need other than as defined in the later act, it follows that respondent's claim cannot now be allowed or paid, except on the basis, and to the extent, of its recognition under the 1939 act. Even though there may have been accruals upon a claim preferred under either the 1935 act or the 1937 act, payment thereof has been rightfully disclaimed. Disbursements by the director are now controlled by the 1939 act."

These decisions demonstrate that the due process and equal protection clauses of our state and Federal constitutions are not applicable to the situation here presented.

Turning to the third ground of unconstitutionality, these appellants are entitled to question the sufficiency of the title of initiative 178. While the legislature or the people

may amend or repeal initiative 172, they must comply with applicable provisions of the state constitution as to the manner in which this may be accomplished. Until initiative 172 is so amended or repealed, persons who qualify under its provisions are entitled to assistance as provided therein. Consequently, these appellants may properly attack initiative 178 on the ground stated. However, the title of the amendatory act and the ballot title are sufficient for the reasons stated in the majority opinion.

As stated above, I entertain serious doubts as to whether these appellants may raise the first two questions presented. In my opinion, they are not entitled to declaratory relief (except as to the question of the sufficiency of the act and ballot titles) because there is no actual justiciable controversy. *Conaway v. Time Oil Co.*, 34 Wn. (2d) 884, 210 P. (2d) 1012. Neither are they entitled to any injunction, since the act affords them an adequate remedy at law if any of them is not treated fairly by the director of social security in administering the act (Laws of 1949, §§ 8 and 9, chapter 6, providing for a fair hearing before the director and the right of appeal to the courts).

For the reasons herein stated, I concur in the affirmance of the judgment of the trial court.

FINLEY, J. (dissenting in part and concurring in part)— I dissent and strongly disagree with the majority views respecting the constitutionality of the delegation of legislative power in initiative 178. I concur in some of the views, and in the disposition of the consolidated cases indicated in the majority opinion. This may be further explained as follows:

I agree with the majority view that this court should consider the constitutional questions relating to initiative 178. This is based upon convictions that questions of large public importance are involved; that the views of this court might very well be of some considerable importance and perhaps of some assistance to the other two co-ordinate branches of state government, and that procedural hurdles and legal technicalities should not be allowed to impede

this court in the performance of this service. The references in the majority opinion to the declaratory judgment act and the possible equity powers of courts, accompanied by citations of authority, are concurred in by me.

Delegations of legislative authority have been accorded constitutional validity consistently by the courts, provided the delegations are limited by some reasonably definitive statement of policy, or standards, constituting some restraint, a guide or boundary relative to administrative activity permitted or directed by the statute. The kind of policy statement or standard required by the courts, its extent or detail, its degree of clarity, and its definiteness, has varied. Seemingly, the variation depends upon the particular field of administrative activity, the newness of administrative activity in the field, and necessities involved —to mention only a few of the factors considered by the courts in passing upon delegations of legislative power. The trend in judicial thinking clearly is to approve delegations of broad discretion to administrative agencies. In some cases, this has been true almost to the point of requiring the barest minimum by way of policy statement or standard. The majority cites ample and acceptable authority for the foregoing. A possible minor digression may be in order at this point.

It is only being realistic to recognize the creation of administrative agencies and the evolution of administrative law as a natural development and outgrowth of our dynamic democracy. The interstate commerce commission, later the Federal trade commission, along with other agencies at Federal level, now accepted and accorded general approval, were most severely criticized for several years, both from the standpoint of their creation and with respect to their subsequent operations. Realistically again, the interstate commerce commission was a *result* of quite a basic change in our way of life, rather than a *causative* factor in itself. In other words, somewhat antedating creation of the commission, steam engines had been invented and railroads had been established. The commission was the outgrowth

of that basic change in American life—a natural and proper development in the field of government to meet a changed and changing situation in the relationships of citizens.

. Against the foregoing backdrop, let us now consider specific provisions of initiative 178. Subsequent references relate to initiative 178, unless otherwise indicated. The statement of policy in § 2, namely, that such public assistance shall be made available "as is necessary to insure to recipients thereof a reasonable subsistence compatible with decency and health," considered alone, might, in my judgment, meet judicial tests of constitutionality, and result in approval of the delegation of legislative authority. This is even more persuasive if, in addition to the policy statement, we consider (1) the necessity for state administrative conformance to Federal requirements (initiative 178, § 2; initiative 172, § 17); (2) the requirement that grants shall be awarded on a uniform statewide basis (§ 5); and (3) the fact, possibly not emphasized too clearly, by the majority, that the policy statement of chapter 6, Laws of 1949 (initiative 172), is nowhere specifically repealed by initiative 178, and still could be controlling as to administrative activity pursuant to initiative 178. All of this might spell out a policy or guide restricting administrative excesses or plenary power, and by the same token might confer constitutional plausibility on the delegation of power here involved. But several factors detract from the constitutional plausibility of the above-mentioned policy statement in § 2.

First, there is language in § 2 which states:

"This act recognizes that there are possibilities of serious abuses of such a program whereby those least deserving of public aid will benefit at the expense of the deserving, and of the state and its political subdivisions, and it is intended hereby to make possible sufficient administrative control of the program of assistance to curb or at least minimize such abuses without at the same time depriving qualified applicants and recipients of the assistance to which they are rightfully entitled."

This quoted language possibly conflicts with, strengthens, or weakens the policy compulsion of the words, ". . . reasonable subsistence compatible with decency and health," depending upon a particular administrator's *notion* of what constitutes an abuse in public assistance administration.

Second, the above-quoted policy language regarding "abuses," coupled with language in §§ 3 through 8, for example in § 4, the terms (1) "maximum values," (2) "maximum units," (3) "unit value," and (4) "ceiling values," which relate to recipient-owned homes, personal property, and belongings, might not add up·to an objective standard.

At the risk of losing the interest of the reader, but so that the significance and impact of the above-quoted terms may be better understood, some very pertinent language from § 4 is quoted, at some length, as follows:

"The department shall, by rule and regulation, fix maximum values for both a home as defined in paragraph (a) and the personal property and belongings as defined in paragraph (b); and shall also fix maximum units of personal property, regardless of value. If the reasonable value of such home property or personal property and belongings exceeds the maximum values so established or the unit value, then the person owning such property shall be deemed to have a resource available to meet his needs over and above the amount necessary for home ownership or ownership of personal property and belongings, or both, as established by the department, and which can be utilized toward meeting his need by investment, and it shall be deemed that such excess value is capable of producing an income to such person at a return of not less than four per cent per annum. In the computation of income and resources for the purpose of determining need, such person shall be charged with an annual income equal to four per cent of such excess valuation or the actual earnings therefrom, whichever is the greater.

"The department shall also, by rule and regulation, fix ceiling values on both home property and personal property and belongings, and if any applicant for, or recipient of, public assistance possesses home property or personal property and belongings, or both, of a value in excess of such

ceiling values, such person shall be ineligible for public assistance.

"Value shall be the current fair market value, less liens and encumbrances of record."

Apparently, under the above-quoted language, the administrator would fix (1) maximum values and (2) ceiling values. If the "reasonable value" (perhaps, this means "current fair market value, less liens and encumbrances of record") of a home, or other property (real and personal) owned by a recipient of public assistance, exceeds (1) the maximum value or (2) the ceiling value, his grant would be reduced by a fixed percentage in the first case, or canceled in the second.

To recapitulate: An administrator's ideas as to (1) "abuses," coupled with his ideas as to (2) "maximum values," "maximum units," "unit value," or "ceiling values," and the influence of the one upon the other, might easily result in grants being increased, reduced, or canceled altogether. Thus, too much would depend upon *subjective* criteria of that individual official. It could be merely a matter of subjective emphasis. Furthermore, the first-described policy of § 2 as to ". . . reasonable subsistence compatible with decency and health," might too easily be affected, and fluctuate with the tenure of administrators.

Thus, the first-described policy statement of § 2, even though strengthened by some provisions of initiative 178, could be so eroded by other provisions of the initiative, and so weakened, it would become little more than "window dressing." This might add up to constitutional defects, but such defects are not past possible correction.

Our democracy, in its dynamics, has turned its back upon the almshouse system of providing assistance to the needy. Admittedly, we are in a period of evolution and relatively new experimentation in this field of governmental operations. Social security and public assistance programs have been criticized severely, and, in some respects, perhaps, justifiably. Of one thing we may be sure, some type of public assistance program will be with us for some time

to come. Initiative 178, like its predecessors, contemplates the providing of grants to those in need of public assistance; grants which the recipients may spend somewhat as they choose. This being understood, the provisions of initiative 178, relative to internal administrative problems (§§ 3 through 8, and possibly part of § 9), become most important. It is these provisions which purport to regulate the methods by which the size of particular grants will finally be determined and find their way to the individual recipients. It is here that the statements of policy contained in § 2 of initiative 178 break down. The policy could very well become meaningless in view of my evaluation of the so-called standards for internal administrative activity. Each examined administrative guide or standard appears to lack objectivity. For example, "need," and "maximum value on such conveyance," relate finally, in each instance, to subjective determinations of the administrator or the agency. The language of § 3, relative to "need," illustrates the point quite well, and is quoted as follows:

"Section 3. (e) 'Need'—The amount by which the requirements of an individual for himself and the dependent members of his family, as measured by the standards of the department, exceed all income and resources available to such individual in meeting such requirements."

I find too little in the above terms and too little in the definition of such terms in initiative 178 to cause them to mean the same thing to the minds or to the experience of two different administrators. Recognizing the fact that some of our sister states employ little or no standards in the enactment of public assistance legislation (see Illinois statute—Smith-Hurd, Illinois Annotated Statutes (Perm. ed.), chapter 23, § 394, as commented upon in the majority opinion), this does not convince me that the procedure used was either desirable, necessary, or that it should be followed in the state of Washington. More clearly definitive statements of policy or standards appear to be more justified in the field of public assistance legislation and activity because of the new and evolutionary nature of the subject

matter. A large segment of the citizens of the state of Washington may obtain benefits through initiative 178. A large portion of the tax revenue of the state may be required to carry out this public assistance program, with no inconsiderable influence upon the availability of tax revenue for other equally important governmental activities. It is only good policy and good government that the basic legislation developed to establish the public assistance program be framed in such a manner as to provide the administrator not only a statement of policy, but also administrative "guides" which can be tested objectively.

As discussed above, the *subjective* criteria of the individual administrator, as he interprets and applies the administrative "guides" contemplated by initiative 178, will significantly determine the economic status and living conditions of recipients. The same subjective criteria could allow Mr. X, administrator in 1951, or Mr. Y, the successor administrator, in 1961, to disburse in one year or less a fund appropriated and intended by the legislature to last for an entire biennium; similarly, subjective criteria could allow him to spend only one-half the appropriation, or less, throughout an entire biennium. The one could be magnanimous, the other miserly and wretched. Could it be said that either would add up to sound or desirable state policy?

My acceptance of the majority's view relative to (1) the contemplated delegation of legislative power, (2) the statement of policy, or (3) the contemplated standards contained in initiative 178, that is, constitutionality, depends upon factors hereinafter discussed. These factors involve the possible elimination of constitutional defects mentioned above and hereafter. The principal factor to be considered in this connection is that initiative 178 is not complete in itself. Section 9 specifically anticipates and requires complementary legislation. Some elaboration may be pertinent at this point.

In our state, basic legislation may be enacted by (1) initiative, and by (2) legislative bill; these are the two familiar procedures. A third, somewhat less obvious, pro-

cedure, is possible. It consists of a complementary combination of the first two procedures.

Initiative 178 provides a certain statutory framework contemplating a complicated administrative program relative to public assistance. Amendment 11 to the state constitution relates to appropriations. It reads in part: "No moneys shall ever be paid out of the treasury . . . except in pursuance of an appropriation by law." This point is pertinent because initiative 178 does not purport to make an appropriation. By its scheme of things, as pointed out above, the important matter of appropriations is left for action by the state legislature.

Now as a practical matter, the legislature will unquestionably take some action to continue a reasonable program of public assistance, tailored to time, circumstance, public interest and desires, the financial status of the state, public interest and desires respecting other governmental activities or services. What will the legislature do? That is the crucial question, and my concurrence with the majority opinion depends upon the answer.

It has occurred to me, without exploring all possibilities, that the legislature might, on its own initiative, consider and act upon any one of three courses of action:

1. The legislature might refuse to appropriate funds to implement initiative 178. It might disregard initiative 178 and enact a complete substitute statute appropriating funds exclusively for the implementation of such substitute legislation. (No opinion is expressed here as to the constitutionality of this procedure.)

2. The legislature might appropriate a certain amount of money for the implementation of initiative 178, without any strings whatsoever on such appropriation.

3. The legislature might appropriate funds for the implementation of initiative 178, with strings attached, providing administratively flexible, but clearly definitive and restrictive, budgetary guides for the disbursement of such funds.

No funds for the payment of benefits are appropriated directly by, or in, initiative 178. Now, if the *legislature* should follow the first course of action mentioned above, and *should not appropriate funds* for the *implementation of initiative 178*, benefits thereunder could not be paid by the department. It is doubtful if appellants would have any legally cognizable claims to benefits under initiative 178 if there were no funds or appropriations available to the department for payment of such claims. Any interests or suggested rights of appellants under initiative 178 would be speculative or inchoate. In such an event, it is my opinion that the questions involving payment of benefits under initiative 178 in the consolidated cases would be moot. Non-availability of funds is not a result beyond the realm of possibility, because the legislature might interpret the words, ". . . the legislature shall appropriate such funds as are necessary to carry out the purposes of this act . . .," in § 9 of initiative 178, as a request with moral or political suasion, but lacking legal compulsion. No practical method occurs to me whereby the legislature could be forced to appropriate funds, under the foregoing hypothesis.

Should the legislature follow the course of action numbered (2) above, I must conclude that the combined legislation (initiative 178, plus an appropriation statute) would fail to provide a sufficient statutory policy or standard for the guidance of the director of the state department of social security, and thus would be an unconstitutional delegation of legislative power. In other words, granting initiative 178 certain euphemistic qualities, nevertheless, the conflicting policy statements in § 2, as discussed above; the language of §§ 3 through 8 as it conflicts with the statements of policy in § 2, as discussed above; and the utter lack of true objectivity in §§ 3 through 8 of initiative 178; all such considerations lead me to the foregoing conclusion.

Should the legislature follow the course of action numbered (3) above, it could supply the missing link in initiative 178. In other words, by providing an administratively flexible, but clearly definitive and restrictive, over-all policy

or standard relative to the disbursement of funds, administrative discretion and activity unquestionably would be channeled. Reasonably precise policy or desires of the legislature then would clearly be paramount and controlling rather than elastic discretion or subjective criteria of an administrator and the state department of social security. In connection with this last, the legislature, after carefully considering (1) the total estimated tax revenue and (2) the funds required by other state governmental operations, might appropriate "x" amount of dollars which it would feel would be appropriate to give effect to its desires or policy relative to public assistance. By the use of qualifying language relative to the appropriations, the director of the state department of social security could be required to spread the appropriations throughout the entire biennium and to spend the entire appropriation, except perhaps some small percentage of the appropriation determined by the legislature to be adequate to cover contingencies in the last few months of the biennium. Budgeting, on a quarterly or perhaps semiannual basis, and consequent revisions in the interpretation and application of internal administrative standards (§§ 3 through 8 particularly), could permit administrative flexibility to accommodate variations in case load, changed circumstances of recipients, and other changing factors inherent in any public assistance program. At the same time, administration could be geared to conform to the over-all biennial standard requiring disbursement of "x" amount of dollars, no more, no less. The effect on the state treasury and on the individual recipient would be the result, then, of legislative discretion, desires, or policy (as well it should), and not the result of some subjective criteria or some idea of an administrator.

In this manner, reasonably precise meaning and effect might be given to the statements of policy in § 2 of initiative 178.

By thus according an over-all controlling effect to statements of policy in § 2 in terms of "x" dollars available and required to be spent, it might be that §§ 3 through 8, plus

those provisions of chapter 6, Laws of 1949, not repealed, could be related to and applied in compliance with the revitalized policy of § 2 and used administratively without constitutional difficulty.

Now, in conclusion, initiative 178 is an incomplete, inoperative piece of legislation, or statutory administrative program. Further complementary legislation is necessary. At this time any interests or suggested rights of appellants are speculative or inchoate. Any possible danger or damage to appellants seemingly pursuant to administrative activity under initiative 178, could be characterized similarly. All is contingent upon legislative action; namely, (1) appropriation of funds, and (2) the manner in which that is to be consummated. When the legislature acts, as it will do, appellants may have interests entitled to constitutional protection by the courts.

I have attempted to outline my views relative to constitutional questions pertinent to initiative 178 when coupled with complementary legislation which I believe the legislature might enact. This appears to me to be justified because of (1) the nature of appellants' interests, and (2) the important questions of public policy involved.

On the basis of the views expressed herein, differing as they do from those of the majority, it is my opinion that the trial court properly dismissed the actions.

SCHWELLENBACH, C. J. (dissenting)—I do not share the enthusiasm for administrative agencies expressed in both the majority opinion and Judge Finley's dissent. If our American way of life has become so complex that the legislative branch of government (or the people acting in their legislative capacity) must of necessity set up some administrative agency to perform the intricate details of the purposes proposed by the legislation then confronting it, it cannot delegate authority to such administrative agency which would leave such agency with unguided or unrestricted discretion. In other words, the legislative branch cannot abdicate, or transfer to others, the essential legislative functions with which it is constitutionally vested.

This becomes more necessary because of the increasingly growing crop of administrative agencies which have sprung up in the past few years. I feel that in initiative 178 the people, acting in their legislative capacity, unlawfully delegated powers to a co-ordinate branch of the government.

The initiative provides that the department shall, by rule and regulation, fix maximum values for both a home and personal property and belongings, and shall also fix maximum units of personal property regardless of value. The initiative also provides that the department shall by rule and regulation fix ceiling values on both home property and personal property and belongings. This gives arbitrary power without restrictions or safeguards to the department. If there should be a change of state administration, a new director, under this act, could completely reverse the rules and regulations adopted under the present director.

Furthermore, there is nothing in the act to prevent the department from first deciding what amount shall be expended and then prorating the amount to be given to each recipient by the device of lowering the maximum values and units and ceiling values. The delegation of such powers, without restrictions, is unlawful and unconstitutional.

HILL, J. (dissenting)—In many particulars the standards established for the administration of this act are less definite and the discretion vested in the administrator is more unlimited than in the statute held to be unconstitutional in *State v. Gilroy*, 37 Wn. (2d) 41, 221 P. (2d) 549.

I recognize that the favorite method of legislation today is to state an objective and then create a bureau, a commission, or a director with full authority to make enforcing regulations. The result is that we are more largely governed by such regulations, state and Federal, than by the statutes enacted by Congress and our legislature.

I see in this act an almost unconditional surrender in the particular area with which it is concerned of the principle that ours is a government of laws and not of men. This

law and this decision will not change our form of government; but repeat it and multiply it in other areas and we will reach that stage, if we have not already passed it, where the form will have survived the substance of the faith.

I shall not prolong this dissent, but I would emphasize one phase of this delegation of legislative power, twice removed, that is now so much taken for granted that the majority, in referring to it, used it as a support for its conclusion. On p. 159 of the majority opinion, it is said:

"At the very least, however, the declaration in No. 178 requires that the state public assistance program be so administered as to qualify the state to receive, in so far as the state's contribution permits, the fullest available measure of Federal matching funds."

What changes there may be in the Federal regulations we have no way of knowing, but nonetheless we are to administer our public assistance program so as to receive the fullest available measure of Federal matching funds. The one certain thing about our uncertain standards is that they must change to comply with those of the Federal overlord. Well may we ask with Cassius, "Upon what meat doth this our Caesar feed, that he is grown so great?" (The answer would lead us into the field of economics and taxation, with which we are not here concerned.)

Being convinced that there is an unconstitutional delegation of legislative power in this act, I dissent.